ENGINE MANUFACTURERS ASSOCIATION ET AL. *v.*
SOUTH COAST AIR QUALITY MANAGEMENT
DISTRICT ET AL.

No. 02–1343.   Argued January 14, 2004—Decided April 28, 2004

*Carter G. Phillips* argued the cause for petitioners. With him on the briefs were *Jed R. Mandel, Timothy A. French, Jeffrey T. Green, Eric A. Shumsky, Kenneth S. Geller, Andrew J. Pincus,* and *John J. Sullivan.*

*Solicitor General Olson* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Sansonetti, Deputy Solicitor General Hungar, Deputy Assistant Attorney General Clark, Jeffrey P. Minear, Greer S. Goldman, John A. Bryson,* and *R. Justin Smith.*

*Seth P. Waxman* argued the cause for respondents. With him on the brief for respondent South Coast Air Quality Management District were *C. Boyden Gray, Jonathan E. Nuechterlein, Luke A. Sobota, Daniel P. Selmi, Fran M. Layton,* and *Barbara Baird. Gail Ruderman Feuer* and

*Christopher J. Wright* filed a brief for respondents Natural Resources Defense Council, Inc., et al.*

JUSTICE SCALIA delivered the opinion of the Court.

Respondent South Coast Air Quality Management District (District) is a political subdivision of California responsible for air pollution control in the Los Angeles metropolitan area and parts of surrounding counties that make up the South Coast Air Basin. It enacted six Fleet Rules that generally prohibit the purchase or lease by various public and private

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States of America by *Catherine E. Stetson, Christopher T. Handman,* and *Robin S. Conrad;* for the Alliance of Automobile Manufacturers et al. by *Arnold W. Reitze, Jr., Stuart A. C. Drake, Eric B. Wolff, Julie C. Becker, Charles H. Lockwood II, Jan S. Amundson, Quentin Riegel, G. William Frick, Ralph Colleli, Jr., Janice K. Raburn,* and *Douglas I. Greenhaus;* and for the American Automotive Leasing Association et al. by *Kipp A. Coddington.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Bill Lockyer,* Attorney General of California, *Manuel M. Madeiros,* Solicitor General, *Richard M. Frank,* Chief Assistant Attorney General, *Theodora Berger,* Senior Assistant Attorney General, *Craig C. Thompson,* Supervising Deputy Attorney General, *Susan L. Durbin,* Deputy Attorney General, and *Kristen M. Campfield,* by *Anabelle Rodríguez,* Secretary of Justice of Puerto Rico, and by the Attorneys General for their respective States as follows: *Terry Goddard* of Arizona, *Thurbert E. Baker* of Georgia, *Lisa Madigan* of Illinois, *G. Steven Rowe* of Maine, *Tom Reilly* of Massachusetts, *Brian Sandoval* of Nevada, *Peter D. Smith* of New Hampshire, *Peter C. Harvey* of New Jersey, *Eliot Spitzer* of New York, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Greg Abbott* of Texas, *William H. Sorrell* of Vermont, *Christine O. Gregoire* of Washington, and *Peggy A. Lautenschlager* of Wisconsin; for the American Academy of Pediatrics (California District) et al. by *David M. Driesen;* for the National League of Cities et al. by *Richard Ruda* and *Timothy J. Dowling;* for the Natural Gas Vehicle Coalition et al. by *Gary S. Guzy;* and for the Sunline Transit Agency by *Lisa Garvin Copeland.*

A brief of *amici curiae* was filed for the American Road & Transportation Builders Association et al. by *Lawrence J. Joseph, Robert Digges, Jr.,* and *Mary Lynn Pickel.*

fleet operators of vehicles that do not comply with stringent emission requirements. The question in this case is whether these local Fleet Rules escape pre-emption under § 209(a) of the Clean Air Act (CAA), 81 Stat. 502, as renumbered and amended, 42 U. S. C. § 7543(a), because they address the purchase of vehicles, rather than their manufacture or sale.

## I

The District is responsible under state law for developing and implementing a "comprehensive basinwide air quality management plan" to reduce emission levels and thereby achieve and maintain "state and federal ambient air quality standards." Cal. Health & Safety Code Ann. § 40402(e) (West 1996). Between June and October 2000, the District adopted six Fleet Rules. The Rules govern operators of fleets of street sweepers (Rule 1186.1), of passenger cars, light-duty trucks, and medium-duty vehicles (Rule 1191), of public transit vehicles and urban buses (Rule 1192), of solid waste collection vehicles (Rule 1193), of airport passenger transportation vehicles, including shuttles and taxicabs picking up airline passengers (Rule 1194), and of heavy-duty on-road vehicles (Rule 1196). All six Rules apply to public operators; three apply to private operators as well (Rules 1186.1, 1193, and 1194).

The Fleet Rules contain detailed prescriptions regarding the types of vehicles that fleet operators must purchase or lease when adding or replacing fleet vehicles. Four of the Rules (1186.1, 1192, 1193, and 1196) require the purchase or lease of "alternative-fuel vehicles,"[1] and the other two

---

[1] These Rules define "alternative-fuel vehicles" in varying ways, but all exclude vehicles that run on diesel. See Rule 1186.1(c)(2), App. 17 (a vehicle with an engine that "use[s] compressed or liquefied natural gas, liquefied petroleum gas (propane), methanol, electricity, or fuel cells. Hybrid-electric and dual-fuel technologies that use diesel fuel are not considered alternative-fuel technologies for the purposes of this rule"); Rule 1192(c)(1), *id.*, at 47 (same definition as Rule 1186.1 for the most part, but

(1191 and 1194) require the purchase or lease of either "alternative-fueled vehicles"[2] or vehicles that meet certain emission specifications established by the California Air Resources Board (CARB).[3] CARB is a statewide regulatory body that California law designates as "the air pollution control agency for all purposes set forth in federal law." Cal.

---

also adds that the vehicle must "mee[t] the emission requirements of Title 13, Section 1956.1 of the California Code of Regulations"); Rule 1193(c)(1), *id.*, at 52 (a vehicle that "uses compressed or liquefied natural gas, liquefied petroleum gas, methanol, electricity, fuel cells, or other advanced technologies that do not rely on diesel fuel"); Rule 1196(c)(1), *id.*, at 66–67 (same definition as Rule 1193 for the most part, but also adds that the vehicle must be "certified by the California Air Resources Board").

[2] Rule 1191(c)(1), *id.*, at 24–25, defines "alternative-fueled vehicle" as a vehicle that "is not powered by gasoline or diesel fuel and emits hydrocarbon, carbon monoxide, or nitrogen oxides, on an individual basis at least equivalent to or lower than a ULEV [acronym described in n. 3, *infra*]." Rule 1194(c)(2), App. 59, defines "alternative-fueled vehicle" as a vehicle that "is not powered by gasoline or diesel fuel."

[3] More specifically, Rules 1191(d), (e)(1), *id.*, at 27–28, require that these vehicles comply with CARB's Low-Emission Vehicle (LEV), Ultra-Low-Emission Vehicle (ULEV), Super-Ultra-Low-Emission Vehicle (SULEV), or Zero-Emission Vehicle (ZEV) standards. Rule 1194(d), *id.*, at 61–63, requires that the vehicles comply with the ULEV, SULEV, or ZEV standards. LEV, ULEV, SULEV, and ZEV are acronyms adopted by CARB as part of a federally approved emission reduction program. This program establishes five tiers of vehicles based on their emission characteristics: Transitional Low-Emission Vehicles (TLEVs); LEVs; ULEVs; SULEVs; and ZEVs. The tiers are subject to varying emission limitations for carbon monoxide, formaldehyde, nonmethane organic gases, oxides of nitrogen, and particulate matter. See Cal. Code Regs., tit. 13, §§ 1960.1(e)(3), (g), (h)(2), (p), § 1961(a) (2004). No vehicle may be sold in California unless it meets the TLEV, LEV, ULEV, SULEV, or ZEV requirements. See Cal. Health & Safety Code Ann. §§ 43009, 43016–43017, 43102, 43105, 43150–43156 (West 1996). Additionally, manufacturers are obligated to meet overall "fleet average" emission requirements. The fleet average emission requirements decrease over time, requiring manufacturers to sell progressively cleaner mixes of vehicles. See Cal. Code Regs., tit. 13, §§ 1960.1(g)(2), 1961(b) (2004). Manufacturers retain flexibility to decide how many vehicles in each emission tier to sell in order to meet the fleet average. See 158 F. Supp. 2d 1107, 1113–1114 (CD Cal. 2001).

Health & Safety Code Ann. § 39602 (West 1996). The Rules require operators to keep records of their purchases and leases and provide access to them upon request. See, *e. g.*, Rule 1186.1(g)(1), App. 23. Violations expose fleet operators to fines and other sanctions. See Cal. Health & Safety Code Ann. §§ 42400–42410, 40447.5 (West 1996 and Supp. 2004).

In August 2000, petitioner Engine Manufacturers Association sued the District and its officials, also respondents, claiming that the Fleet Rules are pre-empted by § 209 of the CAA, which prohibits the adoption or attempted enforcement of any state or local "standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U. S. C. § 7543(a).[4] The District Court granted summary judgment to respondents, upholding the Rules in their entirety. It held that the Rules were not "standard[s]" under § 209(a) because they regulate only the purchase of vehicles that are otherwise certified for sale in California. The District Court recognized that the Courts of Appeals for the First and Second Circuits had previously held that CAA § 209(a) pre-empted state laws mandating that a specified percentage of a manufacturer's in-state sales be of "zero-emission vehicles." See *Association of Int'l Automobile Mfrs., Inc.* v. *Commissioner, Mass. Dept. of Environmental Protection,* 208 F. 3d 1, 6–7 (CA1 2000); *American Automobile Mfrs. Assn.* v. *Cahill,* 152 F. 3d 196, 200 (CA2 1998).[5] It did not express disagreement with these rulings, but distinguished them as involving a restriction on vehicle sales rather than vehicle purchases: "Where a state

---

[4] Petitioner Western States Petroleum Association intervened as a plaintiff. Respondents Coalition for Clean Air, Inc., Natural Resources Defense Council, Inc., Communities for a Better Environment, Inc., Planning and Conservation League, and Sierra Club intervened as defendants.

[5] The ZEV requirements at issue in these cases were virtually identical to those previously promulgated by CARB. See *Association of Int'l Automobile Mfrs., Inc.* v. *Commissioner, Mass. Dept. of Environmental Protection,* 208 F. 3d, at 1, 3; *American Automobile Mfrs. Assn.* v. *Cahill,* 152 F. 3d, at 199.

regulation does not compel manufacturers to meet a new emissions limit, but rather affects the purchase of vehicles, as the Fleet Rules do, that regulation is not a standard." 158 F. Supp. 2d 1107, 1118 (CD Cal. 2001).

The Ninth Circuit affirmed on the reasoning of the District Court. 309 F. 3d 550 (2002). We granted certiorari. 539 U. S. 914 (2003).

II

Section 209(a) of the CAA states:

> "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions . . . as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment." 42 U. S. C. § 7543(a).

The District Court's determination that this express preemption provision did not invalidate the Fleet Rules hinged on its interpretation of the word "standard" to include only regulations that compel manufacturers to meet specified emission limits. This interpretation of "standard" in turn caused the court to draw a distinction between purchase restrictions (not pre-empted) and sale restrictions (pre-empted). Neither the manufacturer-specific interpretation of "standard" nor the resulting distinction between purchase and sale restrictions finds support in the text of § 209(a) or the structure of the CAA.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 194 (1985). Today, as in 1967 when § 209(a) became law, "standard" is defined as that which "is estab-

lished by authority, custom, or general consent, as a model or example; criterion; test." Webster's Second New International Dictionary 2455 (1945). The criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or engine. To meet them the vehicle or engine must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions. This interpretation is consistent with the use of "standard" throughout Title II of the CAA (which governs emissions from moving sources) to denote requirements such as numerical emission levels with which vehicles or engines must comply, e. g., 42 U. S. C. § 7521(a)(3)(B)(ii), or emission-control technology with which they must be equipped, e. g., § 7521(a)(6).

Respondents, like the courts below, engraft onto this meaning of "standard" a limiting component, defining it as only "[a] *production* mandat[e] that require[s] *manufacturers* to ensure that the vehicles they produce have particular emissions characteristics, whether individually or in the aggregate." Brief for Respondent South Coast Air Quality Management District 13 (emphases added). This confuses standards with the means of enforcing standards. Manufacturers (or purchasers) can be made responsible for ensuring that vehicles *comply* with emission standards, but the standards themselves are separate from those enforcement techniques. While standards target vehicles or engines, standard-enforcement efforts that are proscribed by § 209 can be directed to manufacturers or purchasers.

The distinction between "standards," on the one hand, and methods of standard enforcement, on the other, is borne out in the provisions immediately following § 202. These separate provisions enforce the emission criteria—i. e., the § 202 standards. Section 203 prohibits manufacturers from selling any new motor vehicle that is not covered by a "certificate of conformity." 42 U. S. C. § 7522(a). Section 206

enables manufacturers to obtain such a certificate by demonstrating to the Environmental Protection Agency that their vehicles or engines conform to the §202 standards. §7525. Sections 204 and 205 subject manufacturers, dealers, and others who violate the CAA to fines imposed in civil or administrative enforcement actions. §§7523–7524. By defining "standard" as a "production mandate directed toward manufacturers," respondents lump together §202 and these other distinct statutory provisions, acknowledging a standard to be such only when it is combined with a mandate that prevents manufacturers from selling noncomplying vehicles.

That a standard is a standard even when not enforced through manufacturer-directed regulation can be seen in Congress's use of the term in another portion of the CAA. As the District Court recognized, CAA §246 (in conjunction with its accompanying provisions) requires state-adopted and federally approved "restrictions on the purchase of fleet vehicles *to meet clean-air standards*." 158 F. Supp. 2d, at 1118 (emphasis added); see also 42 U. S. C. §§7581–7590. (Respondents do not defend the District's Fleet Rules as authorized by this provision; the Rules do not comply with all of the requirements that it contains.) Clearly, Congress contemplated the enforcement of emission standards through purchase requirements.[6]

Respondents contend that their qualified meaning of "standard" is necessary to prevent §209(a) from pre-empting "far too much" by "encompass[ing] a broad range of state-level clean-air initiatives" such as voluntary incentive pro-

---

[6] The District Court reasoned that "[i]t is not rational to conclude that the CAA would authorize purchasing restrictions on the one hand, and prohibit them, as a prohibited adoption of a 'standard,' on the other." 158 F. Supp. 2d, at 1118. This reasoning is flawed; it is not irrational to view Congress's prescription of numerous detailed requirements for such programs as inconsistent with unconstrained state authority to enact programs that ignore those requirements.

grams. Brief for Respondent South Coast Air Quality Management District 29; *id.*, at 29–30. But it is hard to see why limitation to mandates on manufacturers is necessary for this purpose; limitation to mandates on manufacturers and purchasers, or to mandates on *anyone*, would have the same salvific effect. We need not resolve application of § 209(a) to voluntary incentive programs in this case, since all the Fleet Rules are mandates.

In addition to having no basis in the text of the statute, treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense. The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them. It is true that the Fleet Rules at issue here cover only certain purchasers and certain federally certified vehicles, and thus do not eliminate all demand for covered vehicles. But if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme.

A command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an "attempt to enforce" a "standard" as a command, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles. We decline to read into § 209(a) a purchase/sale distinction that is not to be found in the text of § 209(a) or the structure of the CAA.

## III

The dissent expresses many areas of disagreement with our interpretation, but this should not obscure its agreement with our answer to the question "whether these local Fleet Rules escape pre-emption . . . because they address the purchase of vehicles, rather than their manufacture or sale." *Supra*, at 249. The dissent joins us in answering "no." See *post*, at 262–263 (opinion of SOUTER, J.). It reaches a differ-

ent outcome in the case because (1) it feels free to read into the unconditional words of the statute a requirement for the courts to determine which purchase restrictions *in fact* coerce manufacture and which do not; and (2) because it believes that Fleet Rules containing a "commercial availability" proviso do not coerce manufacture.

As to the first point: The language of § 209(a) is categorical. It is (as we have discussed) impossible to find in it an exception for standards imposed through purchase restrictions rather than directly upon manufacturers; it is even more inventive to discover an exception for only that *sub*category of standards-imposed-through-purchase-restrictions that does not coerce manufacture. But even if one accepts that invention, one cannot conclude that these "provisos" save the day. For if a vehicle of the mandated type *were* commercially available, thus eliminating application of the proviso, the need to sell vehicles to persons governed by the Rule would effectively coerce manufacturers into meeting the artificially created demand. To say, as the dissent does, that this would be merely the consequence of "market demand and free competition," *post*, at 263, is fanciful. The demand is a demand, not generated by the market but compelled by the Rules, which in turn effectively compels production. To think that the Rules are invalid until such time as one manufacturer makes a compliant vehicle available, whereupon they become binding, seems to us quite bizarre.

The dissent objects to our interpretive method, which neither invokes the "presumption against preemption" to determine the *scope* of pre-emption nor delves into legislative history. *Post*, at 260–261. Application of those methods, on which not all Members of this Court agree, demonstrably makes no difference to resolution of the principal question, which the dissent (after applying them) answers the same as we. As for the additional question that the dissent reaches, we think the same is true: The textual obstacles to the strained interpretation that would validate the Rules by rea-

son of the "commercial availability" provisos are insurmountable—principally, the categorical words of § 209(a). The dissent contends that giving these words their natural meaning of barring implementation of standards at the purchase and sale stage renders superfluous the second sentence of § 209(a), which provides: "No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment." 42 U. S. C. § 7543(a). We think it not superfluous, since it makes clear that the term "attempt to enforce" in the first sentence is not limited to the actual imposition of penalties for violation, but includes steps preliminary to that action. *Ibid.* The sentence is, however, fatal to the *dissent's* interpretation of the statute. It *categorically* prohibits "certification, inspection, or any other approval" as conditions precedent to sale. Why in the world would it do that if it had no *categorical* objection to standards imposed at the sale stage? Why disable the States from assuring compliance with requirements that they are authorized to impose?

The dissent next charges that our interpretation attributes carelessness to Congress because § 246 *mandates* fleet purchasing restrictions, but does so without specifying "notwithstanding" § 209(a). *Post,* at 264. That addition might have been nice, but hardly seems necessary. It is obvious, after all, that the principal sales restrictions against which § 209(a) is directed are those requiring compliance with *state*-imposed standards. What § 246 mandates are fleet purchase restrictions under *federal* standards designed precisely for *federally required* clean-fuel fleet vehicle programs—which programs, in turn, must be *federally approved* as meeting detailed *federal specifications.* It is not surprising that a "notwithstanding" § 209(a) did not come to mind. Far from casting doubt upon our interpretation, § 246

is impossible to reconcile with the *dissent's* interpretation. The fleet purchase standards it mandates must comply strictly with federal specifications, being neither more lenient nor more demanding. But what is the use of imposing such a limitation if the States are entirely free to impose their *own* fleet purchase standards with entirely different specifications?

Finally, the dissent says that we should "admit" that our opinion pre-empts voluntary incentive programs. *Post,* at 265–266. Voluntary programs are not at issue in this case, and are significantly different from command-and-control regulation. Suffice it to say that nothing in the present opinion necessarily *entails* pre-emption of voluntary programs. It is at least arguable that the phrase "adopt or attempt to enforce any standard" refers only to standards that *are* enforceable—a possibility reinforced by the fact that the prohibition is imposed only on entities (States and political subdivisions) that have power to enforce.

## IV

The courts below held all six of the Fleet Rules to be entirely outside the pre-emptive reach of § 209(a) based on reasoning that does not withstand scrutiny. In light of the principles articulated above, it appears likely that at least certain aspects of the Fleet Rules are pre-empted. For example, the District may have attempted to enforce CARB's ULEV, SULEV, and ZEV standards when, in Rule 1194, it required 50% of new passenger-car and medium-duty-vehicle purchases by private airport-shuttle van operators to "meet ULEV, SULEV, or ZEV emission standards" after July 1, 2001, and 100% to meet those standards after July 1, 2002.[7] See Rules 1194(d)(2)(A)–(B), App. 62.

It does not necessarily follow, however, that the Fleet Rules are pre-empted *in toto.* We have not addressed a

_____

[7] For a description of the ULEV, SULEV, and ZEV standards, see n. 3, *supra.*

number of issues that may affect the ultimate disposition of petitioners' suit, including the scope of petitioners' challenge, whether some of the Fleet Rules (or some applications of them) can be characterized as internal state purchase decisions (and, if so, whether a different standard for preemption applies), and whether § 209(a) pre-empts the Fleet Rules even as applied beyond the purchase of new vehicles (*e. g.,* to lease arrangements or to the purchase of used vehicles). These questions were neither passed on below nor presented in the petition for certiorari. They are best addressed in the first instance by the lower courts in light of the principles articulated above.

The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, dissenting.

The Court holds that preemption by the Clean Air Act, 77 Stat. 392, as amended, 42 U. S. C. § 7401 *et seq.,* prohibits one of the most polluted regions in the United States[1] from requiring private fleet operators to buy clean engines that are readily available on the commercial market. I respectfully dissent and would hold that the South Coast Air Quality Management District Fleet Rules are not preempted by the Act.

I

So far as it concerns this case, § 209(a) of the Act provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to [Title II of the Act]." 42 U. S. C.

---

[1] In its *amicus* brief, the United States notes that the Los Angeles South Coast Air Basin is the only region in the country that has been designated an ozone "'extreme' nonattainment" area as defined by the Act. Brief for United States as *Amicus Curiae* 7 (citing 40 CFR § 81.305 (2003)).

§ 7543(a). The better reading of this provision rests on two interpretive principles the majority opinion does not address.

First, "[i]n all pre-emption cases, and particularly in those [where] Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc.* v. *Lohr,* 518 U. S. 470, 485 (1996) (citation and internal quotation marks omitted); see also *Wisconsin Public Intervenor* v. *Mortier,* 501 U. S. 597, 605 (1991) (applying presumption against preemption to a local regulation). The pertinence of this presumption against federal preemption is clear enough from the terms of the Act itself: § 101 states that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U. S. C. § 7401(a)(3);[2] see *Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 442 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"). The resulting presumption against displacing law enacted or authorized by a State applies both to the "question whether

---

[2] The original version of this provision specified that "the prevention and control of air pollution at its source is the primary responsibility of States and local governments." § 1(a)(3), 77 Stat. 393. It is irrelevant that the 1967 amendments to the Act (which separated the existing Act into separate titles) moved this finding to Title I rather than Title II (which regulates motor vehicle emissions). There is no doubt that § 101 recognizes state primacy over efforts to control pollution from all sources. Indeed, § 101 specifically notes that the "air pollution" to which it refers is "brought about by," among other causes, "motor vehicles." 42 U. S. C. § 7401(a)(2).

Congress intended any pre-emption at all" and to "questions concerning the *scope* of [§ 209(a)'s] intended invalidation of state law." *Medtronic, supra,* at 485 (emphasis in original).

Second, legislative history should inform interpretive choice, and the legislative history of this preemption provision shows that Congress's purpose in passing it was to stop States from imposing regulatory requirements that directly limited what manufacturers could sell. During the hearings leading up to the 1967 amendments, "[t]he auto industry . . . was adamant that the nature of their manufacturing mechanism required a single national standard in order to eliminate undue economic strain on the industry." S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967). Auto manufacturers sought to safeguard "[t]he ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls," and to prevent "a chaotic situation from developing in interstate commerce in new motor vehicles." H. R. Rep. No. 728, 90th Cong., 1st Sess., 21 (1967). Cf. Air Pollution Control, Hearings on S. 306 before a Special Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, 89th Cong., 1st Sess., 91 (1965) (Sen. Muskie) ("Do you think a given manufacturer could produce automobiles meeting 50 standards?"). Congress was not responding to concerns about varying regional appetites for whatever vehicle models the manufacturers did produce; it was addressing the industry's fear that States would bar manufacturers from selling engines that failed to meet specifications that might be different in each State.[3]

---

[3] In fact, Congress allowed California to adopt its own specification standards, 42 U. S. C. § 7543(b) (§ 209(b) of the Act); see also S. Rep. No. 403, 90th Cong., 1st Sess., 33 (1967), but only California was so indulged. Cf. 42 U. S. C. § 7507 (§ 177 of the Act) (reiterating that States may not require the creation of "a motor vehicle or motor vehicle engine different than a motor vehicle or engine certified in California under California standards (a 'third vehicle')").

Section 209(a) can easily be read to give full effect to both principles. As amended in 1967, §202 of the Act authorized federal regulators to promulgate emissions standards for "any class or classes of new motor vehicles or new motor vehicle engines." §202(a), 81 Stat. 499. The 1967 amendments in turn defined "new motor vehicle" as "a motor vehicle the equitable or legal title to which has never been transferred to an ultimate purchaser," and a "new motor vehicle engine" as "an engine in a new motor vehicle or a motor vehicle engine the equitable or legal title to which has never been transferred to the ultimate purchaser." §212(3), 81 Stat. 503. Section 202 of the 1967 Act, in other words, is naturally understood as concerning itself with vehicles prior to sale and eligible to be sold. Section 203 further underscored this focus on what manufacturers could produce for sale: as incorporated in the 1967 amendments, §203 prohibited a variety of acts by manufacturers, but left vehicle purchasers and users entirely unregulated. 81 Stat. 499.

On this permissible reading of the 1967 amendments, §209(a) has no preemptive application to South Coast's fleet purchase requirement. The National Government took over the direct regulation of manufacturers' design specifications addressing tailpipe emissions, and disabled States (the California exception aside, see n. 3, *supra*) from engaging in the same project. The "standards" that §209(a) preempts, accordingly, are production mandates imposed directly on manufacturers as a condition of sale. Section 209(a) simply does not speak to regulations that govern a vehicle buyer's choice between various commercially available options.

This is not to say that every conceivable purchase restriction would be categorically free from preemption. A state law prohibiting any purchase by any buyer of any vehicle that failed to meet novel, state-specified emissions criteria would have the same effect as direct regulation of car manufacturers, and would be preempted by §209(a) as an "attempt to enforce [a] standard relating to the control of emissions

from new motor vehicles." 42 U. S. C. § 7543(a). But that fantasy is of no concern here, owing to a third central point that the majority passes over: South Coast's Fleet Rules require the purchase of cleaner engines only if cleaner engines are commercially available. *E. g.,* App. 69 (Fleet Rule 1196(e)(1)(C) (exempting fleets from Rule if no complying engine "is commercially available from any manufacturer . . . or could be used in a specific application")); see also App. 21, 30, 50, 55, 63 (Fleet Rules 1186.1(e), 1191(f)(8), 1192(e)(2), 1193(e)(3), and 1194(e)(2)). If no one is selling cleaner engines, fleet owners are free to buy any vehicles they desire. The manufacturers would, of course, understand that a market existed for cleaner engines, and if one auto maker began producing them, others might well be induced to do the same; but that would not matter under the Act, which was not adopted to exempt producers from market demand and free competition. So long as a purchase requirement is subject to a commercial availability proviso, there is no basis to condemn that kind of market-based limitation along with the state command-and-control regulation of production specifications that prompted the passage of § 209.

In sum, I am reading "standard" in a practical way that keeps the Act's preemption of standards in tune with Congress's object in providing for preemption, which was to prevent the States from forcing manufacturers to produce engines with particular characteristics as a legal condition of sale. The majority's approach eliminates this consideration of legislative purposes, as well as the presumption against preemption, by acting as though anything that could possibly be described as a standard must necessarily be a "standard" for the purposes of the Act: a standard is a standard is a standard.[4] The majority reveals its misalliance with Ger-

---

[4] This same hypersimplification allows the majority to mischaracterize my narrower definition of "standard" as the illegitimate creation of a nontextual exception to § 209(a)'s categorical preemption of standards. *Ante,* at 256.

trude Stein throughout its response to this dissent. See *ante*, at 256–257, 258.

II

Reading the statute this way not only does a better job of honoring preemption principles consistently with congressional intent, but avoids some difficulties on the majority's contrary interpretation. To begin with, the Court's broad definition of an "'attempt to enforce any standard relating to the control of emissions,'" *ante*, at 252, renders superfluous the second sentence of § 209(a), which provides that "[n]o State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle . . . as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle," 42 U. S. C. § 7543(a). At the very least, on the majority's view, it is hard to imagine any state inspection requirement going to the control of emissions from a new motor vehicle that would not be struck down anyway as an attempt to enforce an emissions standard.

Next, on the majority's broad interpretation of "standard," Congress would seem to have been careless in drafting a critical section of the Act. In the one clear instance of which we are aware in which the Act authorizes States to enact laws that would otherwise be preempted by § 209, Congress expressly provided that the authorization is effective notwithstanding that preemption section. See 42 U. S. C. § 7507 (authorizing States to adopt California production mandates "[n]otwithstanding section 7543(a) of this title"). The natural negative implication is that, if a statutory authorization does not include such a "notwithstanding" clause or something similar, its subject matter would not otherwise be preempted by § 209(a). Given that, the majority's interpretation of the scope of § 209(a) is difficult to square with § 246, which requires States to establish fleet purchasing requirements for "covered fleet operator[s]" in ozone and carbon monoxide "nonattainment areas" (that is, regions strug-

gling with especially intractable pollution), 42 U. S. C. § 7586. Section 246 thus requires States, in some cases, to establish precisely the kind of purchaser regulations (adopted here by a lower level governmental authority) that the majority claims have been preempted by § 209(a). But § 246 gives no indication that its subject matter would otherwise be preempted; there is certainly no "notwithstanding" clause. This silence suggests that Congress never thought § 209(a) would have any preemptive effect on fleet purchasing requirements like the ones at issue.

Finally, the Court suggests that both voluntary incentive programs, *ante*, at 254–255, and internal state purchasing decisions, *ante*, at 258–259, may well be permissible on its reading of § 209(a). These suggestions are important in avoiding apparent implausibility in the majority's position; if a State were said to be barred even from deciding to run a cleaner fleet than the National Government required, it would take an airtight argument to convince anyone that Congress could have meant such a thing. But it is difficult, when actually applying the majority's expansive sense of forbidden "standard," to explain how the specification of emissions characteristics in a State's internal procurement guidelines could escape being considered an impermissible "adopt[ion of a] standard," 42 U. S. C. § 7543(a), even if the standard only guided local purchasing decisions. By the same token, it is not obvious how, without some legal sleight of hand, the majority can avoid preempting voluntary incentive programs aimed at the private sector; the benefit proffered by such schemes hinges on the recipient's willingness to buy a vehicle or engine that complies with an emissions standard (*i. e.*, a vehicle or engine that, in the words of the majority, "must not emit more than a certain amount of a given pollutant, must be equipped with a certain type of pollution-control device, or must have some other design feature related to the control of emissions," *ante*, at 253). Such a program clearly "adopt[s]" an emissions standard as

the majority defines it. Cf. *ibid.* (cautioning respondents not to "confus[e] standards with the means of enforcing standards"). The Court should, then, admit to preemption of state programs that even petitioners concede are not barred by § 209(a). See Reply Brief for Petitioners 7 (acknowledging that § 209(a) does not preempt voluntary incentive programs). That is not a strong recommendation for the majority's reading.

## III

These objections to the Court's interpretation are not, to be sure, dispositive, standing alone. They call attention to untidy details, and rightly understood legislation can be untidy: statutes can be unsystematic, redundant, and fuzzy about drawing lines. As a purely textual matter, both the majority's reading and mine have strengths and weaknesses. The point is that the tie breakers cut in favor of sustaining the South Coast Fleet Rules. My reading adheres more closely to the legislative history of § 209(a). It takes proper account of the fact that the Fleet Rules with this commercial availability condition do not require manufacturers, even indirectly, to produce a new kind of engine. And, most importantly, my reading adheres to the well-established presumption against preemption.