**NEWELL BRANDS, INC.,**
**Plaintiff/Counter-**
**Defendant**

v.

**KIRSCH LOFTS, LLC,**
**Defendant/Counter-**
**Plaintiff**

**CASE NO. 1:15-CV-597**

United States District Court,
W.D. Michigan, Southern Division.

Signed September 15, 2016

Cherie Phears O'Reilly, Schiff Hardin LLP, Atlanta, GA, Gabriel M. Rodriguez, Joshua R. More, Katherine Somers Walton, James Michael Showalter, Schiff Hardin LLP, Chicago, IL, for Plaintiff/Counter-Defendant.

Dennis William Bila, II, Bila & Associates, PLLC, Harbor Springs, MI, for Defendant/Counter-Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT J. JONKER, UNITED STATES DISTRICT JUDGE

Newell Brands, Inc. owns contaminated property near Sturgis, Michigan, and is obligated to remediate it and neighboring parcels under a consent decree. Newell filed this action to obtain access to Kirsch Lofts' property to conduct a portion of the remediation. The parties reached agree-

ment on the access itself, but Kirsch's counterclaim remains in dispute. The counterclaim asserts that Newell is liable under Mich. Comp. Laws 324.20135a(1)(a) ("the Access Statute") for damages relating to this Court's grant of access to Newell to conduct remediation efforts on property owned by Kirsch. Newell seeks summary judgment dismissing Kirsch's counterclaim or limiting any recovery to $72,964, Newell's estimated value of the access damages (ECF No. 88). Kirsch opposes summary judgment and claims its damages are $9.75 million, based principally on delay of commercial and residential development Kirsch had planned for its property (ECF No. 100). The Court heard oral argument on this motion on September 8, 2016.[1]

## BACKGROUND

Kirsch Lofts, LLC, is a Michigan single-member limited liability company that owns a former manufacturing facility (the Facility") on a parcel of real estate located at 308 N. Prospect Street, in Sturgis, Michigan (the "Property"). It bought the Property in 2009 from a third party, who had bought the property from Newell. Scott T. Bosgraaf ("Bosgraaf") runs Kirsch. In 1997, Newell acquired a large industrial parcel, including the parcel later sold to Kirsch, from Cooper Industries. Newell's acquisition included assumption of responsibility for remediation activities under a consent decree that requires TCE cleanup to a level not greater than 100 parts per million.

## I. Kirsch's Purchase and Initial Development of the Property

Kirsch Lofts purchased its parcel on July 10, 2009, for $57,544.25 (EFC No. 88-13, PageID.1920). Kirsch's proposed development plan included three phases: (1) residential, (2) commercial, and (3) more residential. Id. at PageID.1936. This plan included building thirty to fifty condominiums on the Property and selling them for an average of $125,000. Id. at PageID.1943. Kirsch claims that, at the time of purchase, remediation activities being conducted on the Property were consistent with, and could coexist with, its redevelopment plans (ECF No. 100, PageID.2842). According to Kirsch, it did not anticipate remediation activities beyond the groundwater treatment that existed at the time it purchased the Property. Id. Moreover, Kirsch claims that some contamination at manageable levels was actually necessary for its development plans, which depended on "Brownfield" and related tax credits.[2]

To finance its development efforts, Kirsch partnered with the City of Sturgis and obtained the following tax credits and incentives: (1) MDEQ Loan and Grant for $2 million[3]; (2) Brownfield Michigan Business Tax Credit for $1.6 million (ECF No. 41-3); (3) Brownfield TIF Reimbursement for $3.2 million (ECF No. 41-4, PageID.412); and (4) New Markets Tax Credit Allocation for $4.2 million (ECF No. 41-5). Kirsch says that each of these

1. Newell's Motion in Limine to Exclude Untimely Disclosed Documents (ECF No. 91) is **DENIED** and Newell's Motion for Leave to File Supplemental Declaration (ECF No. 105) is **GRANTED**. Newell's Motion to Further Supplement Its Summary Judgment Briefing (ECF No. 118) is **GRANTED**.

2. Newell, however, claims that extensive testing had already been done on the Property, and that Kirsch knew that "significant and lengthy response actions" were needed to

remediate the Property (ECF No. 88, PageID.1700). For purposes of evaluating Newell's summary judgment motion, the Court must accept Kirsch's view of these facts.

3. Kirsch did not provide supporting documentation for this loan and grant because, in its own words, "it does not factor in to the discussion of Newell's delay ... [but] may ... factor into the calculation of damages." (ECF No. 100, PageID.2843).

incentives was time sensitive and Newell does not contest the general point, though its experts dispute some of the details of Kirsch's claims. The Brownfield MBT Tax Credit required Kirsch to complete all three phases of the rehabilitation project by October 10, 2018 (ECF No. 41-3). The NMTC required that Kirsch close on the transaction and begin construction by July 31, 2010 (ECF No. 41-5). The Brownfield TIF reimbursed costs for a period limited to thirty years (ECF No. 41-4).

High levels of TCE were discovered in the Property's soil in late 2009, and the MDEQ, in a letter to Kirsch dated January 27, 2010, requested that it suspend work on its development (ECF No. 41-7). At the time, Kirsch had been following its approved work plan, the next step of which required the installation of a vapor barrier and the pouring of a new concrete floor in the buildings (ECF No. 41-8). Further, on March 22, 2010, the MDEQ sent another letter to Kirsch, which premised final approval for moving forward with the next step of the construction plan on Newell's conducting the soil TCE/PCE investigation and the DNRE's determination of the appropriate remedial actions (ECF No. 41-10, PageID.508). In short, Kirsch says that it was unable to move forward with its development plans.

## II. Newell's Investigation and Remediation

A few months later, as part of the soil investigation procedure, Newell began drilling operations on the Property. These included twenty-eight borings of sixty feet, one boring at thirty-two feet, five borings at twelve feet, and nine borings at two feet. Some of these borings were located in existing buildings. Even though this activity amounted to actual, physical intrusion of its property, Kirsch is making no claim for damages associated with this activity (ECF No. 88, PageID.1714; ECF No. 88-2, PageID.1736). In any event, the intrusion occurred years before any court-ordered access and would not appear to trigger a statutory right to recovery.

▆▆▆ On September 9, 2010, Dr. Meiri, Newell's environmental consultant, provided Newell with several different options for remediating the contaminated soil: (1) In Situ Chemical Oxidation ("ISCO"); (2) In Situ Thermal Treatment ("Thermal"); and (3) Soil Vapor Extraction ("SVE") (ECF No. 41-11, PageID.533). Each method had a different cost and different estimated time of use: (1) Thermal—one year; (2) ISCO—a few months; (3) SVE—six years (ECF No. 41-14, PageID.559-562). In general, the shorter remediation options cost more to implement.[4] Kirsch claims that Newell selected the SVE method because it was the most cost-effective, saving Newell approximately $16-19 million (ECF No. 100, PageID.2846). It was also the method that took the longest to complete. The SVE method consisted of excavating and disposing of the top two feet of soil and installing and operating a SVE well system on the Property.

---

4. Newell seeks to claw back and seal two pages of a PowerPoint presentation presented by a Newell consultant to a group including Newell attorneys (ECF No. 107). Newell's assertion of privilege is **DENIED**. A party asserting privilege has the burden of establishing it. *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 473 (6th Cir.2006). Newell has failed to do so. It has not supported any of its factual statements with affidavits of support. Moreover, the record before the Court undermines any claim of privilege. The person who prepared the slides at issue was an outside environmental consultant, Dr. Meiri, who testified that he prepared the slides without direction or input from anyone else (ECF No. 108-1, PageID.3590-3591). Dr. Meiri also testified that the purpose of the presentation did not involve legal strategy, but was simply to update the management. *Id.* at PageID.3590. These facts undermine any basis for attorney-client or work product privilege.

By September 2010, Kirsch stopped its construction on the Property (ECF No. 8, PageID.126). At that time, the construction efforts consisted of a 103,337 square foot building on the Property without interior finish, windows, heating/cooling, plumbing fixtures or electrical fixtures (ECF No. 88-13, PageID.1931). In January 2011, Kirsch notified Newell that it would no longer be allowed new access to the Property, even if necessary for remediation.[5] The parties continued negotiating regarding access.

In early 2011, Newell presented a project schedule to the MDEQ (ECF No. 41-15). The first step of that schedule involved the performance of a leach test on the soil of the Kirsch parcel to determine the applicable level of cleanup criteria (ECF No. 41-15, PageID.584). Further, Newell's project schedule states that excavation of the top two feet of soil and installation of the SVE system were set to begin on March 2012 and completed by July 23, 2012 (ECF No. 41-15, PageID.416). Later on, however, Newell submitted a revised project schedule. Under this schedule, leach testing is estimated to begin on April 29, 2013, and be completed on June 10, 2015 (ECF No. 41-16, PageID.587). Further, remediation is no longer set to be conducted concurrently with other tasks, but set to begin in May 2016. *Id.* Kirsch claims that as of July 29, 2016, Newell has not yet begun soil excavation or installation of the SVE system (ECF No. 100, PageID.2847).

According to Kirsch, the delay is attributable to Newell's ongoing, and so far unsuccessful, efforts to get MDEQ to agree to a higher TCE cleanup threshold than the 100 ppm in the existing decree. *Id.* at PageID.2848-2849. Since 2010, Newell has worked with the MDEQ to establish cleanup criteria. It has requested a change to the cleanup criteria several times over the

past years, including requests for 222 ug/Kg (ECF No. 41-19, PageID.738); 304 ug/Kg (ECF No. 41-20, PageID.790); 311 ug/Kg (ECF No. 41-18, PageID.714); 566 ug/Kg (ECF No. 41-20, PageID.790); 1,043 ug/Kg (ECF No. 41-17, PageID.652); and 1351 ug/Kg (ECF No. 41-18, PageID.714). The MDEQ rejected each of these requests (ECF No. 100, PageID.2849). On November 9, 2015, Newell submitted its final leach test report to the MDEQ. In that report, the MDEQ again rejected Newell's request to change the cleanup criteria for the Property (ECF No. 100-32, PageID.3082-3083). Of course, the cleanup criteria are a significant driver of cleanup costs and Newell says it is just part of the normal give and take of any superfund cleanup. Kirsch does not contest the point, except to say that Newell should have to reimburse Kirsch for the damages caused by the delay.

### III. Access

In 2013, the parties entered into a limited access agreement allowing for soil testing (ECF No. 8, PageID.128-135). After continued negotiation, however, the parties failed to agree on a more comprehensive access agreement because of disagreement regarding compensation for access (ECF No. 1; ECF No. 8, PageID.134-135). Newell filed its complaint in 2015, seeking a court order for access to perform its government-mandated remediation activities (ECF No. 1). The parties stipulated to an order granting Newell access to the Property, which the Court approved on September 8, 2015 (ECF No. 20). On June 9, 2015, Kirsch filed its counterclaim, seeking damages under the Access Statute against Newell (ECF No. 8). As of July 1, 2016, Kirsch claimed approximately $9.75 million

---

5. Kirsch expected to continue honoring a 1998 easement, but this provided insufficient rights for Newell's remediation plans (ECF No. 8, PageID.127-128).

in damages (ECF No. 100-13, PageID.3455-3456).

## SUMMARY JUDGMENT STANDARD

 Summary judgment is appropriate where the record evidence presents no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it is defined as such by substantive law and will affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute exists, precluding summary judgment, if the court finds that a reasonable jury could find for the nonmoving party. *Id.* The burden is on the moving party to show that no genuine dispute as to any material fact exists. Fed. R. Civ. P. 56(c)(1). Summary judgment is required where, "after adequate time for discovery and upon motion ... a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court draws all inferences in a light most favorable to the nonmoving party. *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992).

## ANALYSIS

The Court must determine whether Kirsch is entitled to compensation for damages relating to this Court's grant of access to the Property to Newell, including compensation for loss of use of the Property. As a preliminary matter, the Court must decide the standard for compensation contemplated by the Access Statute. Because this determination involves interpretation of the relevant statute, it is a question of law. *See United States v. Khalife*, 106 F.3d 1300, 1302 (6th Cir.1997); *Spectrum Health Hospitals v. Farm Bureau Mut. Ins. Co. of Michigan*, 492 Mich. 503, 821 N.W.2d 117, 124 (2012). Once the Court decides the applicable standard for compensation, the question becomes whether any dispute of material fact exists as to Kirsch's entitlement to its claimed damages under the Access Statute. In making this determination on summary judgment, the Court must look at the facts in the light most favorable to the non-moving party.

### I. The Compensation Standard under the Access Statute

 The interpretation of the governing statute, Section 324.20135a(1)(a), is a matter of first impression. In interpreting a statute, courts generally begin with the language of the statute. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Section 324.20135a(1) provides that:

A person who is liable under section 20126 or a lender that has a security interest in all or a portion of a facility may file a petition in the circuit court of the county in which the facility is located seeking access to the facility in order to conduct response activities approved by the department. *If the court grants access to property under this section, the court may do any of the following:*

*(a) Provide compensation to the property owner or operator for damages related to the granting of access to the property, including compensation for loss of use of the property.*

(b) Enjoin interference with the response activities.

(c) Grant any other appropriate relief as determined by the court.

MCL 324.20135a(1)(a) (emphasis added).

It is undisputed by the parties that Newell is the "person ... liable under section 20126" for purposes of the Access

Statute. The relevant "grant[ ] of access" under the Access Statute occurred on September 8, 2015," when the Court approved the parties' stipulated access order (ECF No. 20).

At issue is what is included in "damages related to the granting of access to the property, including compensation for loss of use of the property." Newell argues that the statutory phrase means only those damages "directly caused" by access (ECF No. 88, PageID.1712). Kirsch says the Access Statute permits recovery of much more than that, and includes any damages suffered because of the timing of any access ordered by the Court. In Kirsch's view, the timing of access is "related to" access, and if the timing of access is delayed, and that delay impedes Kirsch's ability to complete development, then the party obtaining the access is on the hook for all resulting damages (ECF No. 100, PageID.2850-2851).

▮▮▮ The Court is not satisfied with either construction. Newell's "directly caused" theory ignores the ordinary meaning of "related to," and also gives inadequate weight to the "loss of use" language in the statute. Generally, courts should interpret a statutory term according to its ordinary meaning. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004). The ordinary meaning of the word "related" is "connected by reason of an established or discoverable relation." Dictionary Definition of "related", MERRIAM-WEBSTER, http://www.merriamwebster.com/dictionary/related. Thus, under the Access Statute, damages are "related to" an access grant if they are fairly traceable or connected to the ongoing access of the responsible party. This goes well beyond damages "directly caused" by access. Moreover, damages recoverable under the Access Statute include "loss of use of the property." Courts "must give effect to ev-

ery word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas. Co. v. Old Republic Ins. Co.*, 466 Mich. 142, 644 N.W.2d 715, 717 (2002). Adopting an interpretation of the statute that limits damages to those "directly caused" by the court's grant of access would largely read this phrase out of the statute.

Kirsch's construction of the statute avoids these problems, but fails to account for all the language of the statute. In particular, courts must, of course, give meaning to all the words and phrases in a statute. *State Farm Fire & Cas. Co.*, 644 N.W.2d at 717. Here, Kirsch rests its argument on the idea that the timing of access is necessarily "related to access" and that damages related to the timing of access—including any delayed development—must be recoverable. The trouble is the phrase "related to access" is not what the statute says. Rather, the controlling statutory phrase is damages "related to the *granting* of access," not simply "related to access." By tethering the recoverable damages to a particular act at a particular time—the time the court grants the access—the legislature expresses an intention to take a snapshot of what the ordered access will entail, whenever it physically occurs, and award a reasonable estimate of the damages fairly traceable to that grant as distinguished from any damages inherent in the ongoing presence of contamination itself.

This limitation avoids exactly the problem presented by Kirsch's damages theory in this case. In effect, what Kirsch is seeking is compensation for the impact of continued contamination on its property, not for the incremental damage triggered by access necessary to remediate it. This problem is evident from even a casual reading of Kirsch's brief. The brief empha-

sizes the damages caused by Newell's delay in remediation. Kirsch asserts that it is "seeking compensation from Newell ... because of the manner in which Newell conducted itself in dealing with contamination." (ECF No. 100, PageID.2858). Kirsch claims that although Newell was "faced with three options for remediation, Newell selected the cheapest method." *Id.* at PageID.2859. "[R]ather than commencing remediation immediately ... Newell focused its efforts on seeking more lenient cleanup criteria." *Id.* "Newell may have saved itself at least $16-19 million with these choices, but it also caused Kirsch significant harm." *Id.* Instead, Kirsch seeks damages for "Newell's failure to remediate the contamination on the Property in a responsible and timely manner," and not for access. *Id.* at PageID.2871.

Not even once does Kirsch itself articulate a theory linking its claimed damages to "the granting of access," or even to "access" for that matter. Rather, Kirsch attempts to stretch the statutory language to provide compensation for a responsible party's failure to remediate, rather than for the access incursion necessary to effect remediation. Indeed, on Kirsch's theory, even if Newell never actually accessed the property, and chose to abandon remediation entirely, Kirsch would still be entitled to recover the same amount under the Access Statute. This turns the point of the Access Statute upside down.

The Court sympathizes with Kirsch's practical plight. If its facts are ultimately established, then Newell is saving itself millions of dollars by delaying remediation while Kirsch is losing millions of dollars in time-sensitive tax credits and other delay damages. But to the extent Kirsch has a remedy for that kind of delay, it is not under the Access Statute.

## II. The Compensation Standard Applied

### a. Kirsch's claims

Here, Kirsch claims losses of approximately $9.75 million stemming from "Newell's failure to remediate the contamination on the Property in a responsible and timely manner" (ECF No. 100, PageID.2852-2857, 2871). Kirsch's claimed damages are divided into several categories, including losses attributable to tax credits, grants, return on investment, carrying costs, depreciation, and increased construction costs (ECF No. 100-13, PageID.3455-3456). The problem is that none of these damages are recoverable under the Access Statute as "related to [the court's] granting of access." Rather, as Kirsch's own brief emphasizes, they are damages based on "Newell's failure to remediate the contamination on the Property in a responsible and timely manner." (ECF No. 100, PageID.2871). Accordingly, none of these claims are compensable under the Access Statute and Newell is entitled to summary judgment so providing.

### b. Newell's claims

Newell is the only party to address any category of damages compensable under the Court's construction of the Access Statute. In particular, Newell has attempted to quantify the incremental cost of access it will at some point need to complete the anticipated remediation efforts on Kirsch's property. Specifically, Newell produced expert deposition testimony showing that, based on the market value of the Property, a reasonable estimate of compensation for a license for access to the Property for necessary remediation activities over sixty-five months is $72,964 (ECF No. 88-13, PageID.1960-1962). Kirsch has not produced any counter expert on this issue and so there is no genuine issue of material fact

as to the value of a license for access activities anticipated for remediation. The undisputed value is $72,964. *Id.*

### c. Other Issues

█ Newell suggests that the Court refuse in its discretion to award any damages because the Access Statute gives the Court equitable discretion. In particular, the statute says that the Court "may" award damages, not that it "must" or "shall" do so. MCL 324.20135a(1). It is true that the statute is permissive, but in the Court's view, this is an appropriate case for an award. Newell will necessarily have to access Kirsch's property for anticipated remediation activities. And those activities will have real, albeit limited, physical impact and intrusion to Kirsch's property interests. The Newell license analysis recognizes as much. The Court does not find any reason to withhold an award of those damages.

Newell also suggests that the Court should order the payment of the license amount as those damages are incurred in the future. The Court declines to do so, especially in a case focused on delayed remediation. The Court's construction of the Access Statute as focusing on a snapshot of necessary access activities anticipated at the time of "granting of access" further militates against an award of payments over time. Any such payment stream could have been discounted to present value as part of an expert analysis, but Newell chose not to do that here. The Court cannot and will not do so on its own.

### CONCLUSION

Accordingly, Newell's motion for summary judgment (ECF No. 87) is **GRANTED** to the extent of excluding from consideration the damages categories that Kirsch advances because they are outside the scope of recovery under the Access Statute. The motion is further **GRANTED** to the extent of awarding Kirsch $72,964

based on the uncontroverted license theory advanced by Newell's expert as a reasonable estimate of compensation for granting of access to complete contemplated remediation activities. The record discloses no genuine issue of material fact over any other damages issue and so there is no need for trial. Judgment will enter on the counterclaim for Kirsch and against Newell in the amount of $72,964.

In addition, Newell's Motion in Limine to Exclude Untimely Disclosed Documents (ECF No. 91) is **DENIED**; Newell's Motion for Leave to File Supplemental Declaration (ECF No. 105) is **GRANTED**; and Newell's Motion to Further Supplement Its Summary Judgment Briefing (ECF No. 118) is **GRANTED**.

### JUDGMENT

In accordance with the Order entered this day, Judgment is entered on the counterclaim for Kirsch against Newell in the amount of $72,964. All other claims and counterclaims have been resolved by agreement, or are otherwise subject to dismissal on terms previously provided.