ROGERS, Circuit Judge,
concurring:
The court describes the context in which the parties differ on when rates under a grandfather clause in the Digital Millennium Copyright Act of 1998 (“DMCA”), Pub. L. No. 105-304, 116 Stat. 2860, are available. I write separately to expand on the reasons for my concurrence.
As a general rule, grandfather clauses that operate in derogation of a statute’s dominant purpose should be narrowly construed. Patagonia Corp. v. Bd. of Governors, 517 F.2d 803, 811 (9th Cir. 1975). The DMCA defines a “preexisting subscription service” (“PSS”) as
a service that performs sound recordings by means of noninteractive audio-only subscription digital audio transmissions, which was in existence and was making such transmissions to the public for a fee on or before July 31, 1998, and may include a limited number of sample channels representative of the subscription service that are made available on a nonsubscription basis in order to promote the subscription service.
17 U.S.C. § 114(j)(ll). The parties offer differing interpretations of the phrase “such transmissions” and the word “service.” Although the court does not view the former as “the crucial phrase,” Op. at 716, it considers the word “service” to present “persistent confusion,” id. at 716. Does it refer only to the business entity or also to the entity’s original program offerings? Congress uses words to have their ordinary meaning, absent a contrary indication, see Engine Manufacturers Ass’n v. *720 South Coast Air Quality Management District, 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004), and there is none here; the word “service” can mean both an entity (such as a branch of the armed services) and the activity performed by that entity. E.g., Random House Webster’s College Dictionary 1199 (2d ed. 1999) (“the supplying or supplier of utilities ... that meet a public need”) (emphasis added).
Where there are two plausible interpretations of the statutory text, the court has turned to the legislative history to discover congressional intent. See Am. Bankers Ass’n v. Nat’l Credit Union Admin., 271 F.3d 262, 271 (D.C. Cir. 2001). Indeed, the court has done so even when the text is superficially clear. See Sierra Club v. EPA, 358 F.3d 976, 988 (D.C. Cir. 2004). Today the court is quick to dismiss that history as “no more pellucid” than the statutory text merely because it too uses the term “service” both ways. Op. at 717. But this ignores clear evidence of congressional intent: the conferees gave careful consideration to the intended extent of PSS eligibility for grandfather rates, and their analysis resolves the debate over the meaning of the grandfather clause in favor of SoundExehange.
The Conference Report of the House and Senate conferees confirms that Muzak’s non-Dish offerings are ineligible for PSS rates. The Report states that “[t]he purpose of distinguishing preexisting subscription services making transmissions in the same medium as on July 31, 1998, was to prevent disruption of the existing operations by such services,” and that “[tjhere [are] only three such services that exist: DMX (operated by TCI Music), Music Choice (operated by Digital Cable Radio Associates), and the DiSH Network (operated by Muzak).” H.R. Conf. Rep. 105-796, at 80-81 (1998), reprinted in 1998 U.S.C.C.A.N. 639, 656-57. The Report paraphrased the statutory definition, stating that a PSS “is a noninteractive subscription service that was in existence and was making transmissions to the public on or before July 31, 1998, and which is making transmissions similar in character to such transmissions made on or before July 31, 1998.” Id. at 89, reprinted in 1998 U.S.C.C.A.N. at 665 (emphasis added). The Report proceeded to illustrate the extent of a PSS’s offerings that would be eligible for the grandfather rates, explaining the grandfather clause covered two circumstances only: “In grandfathering these services [i.e., the three PSSs], the conferee’s objective was to limit the grandfather [1] to their existing services in the same transmission medium and [2] to any new services in a new transmission medium where only transmissions similar to their existing service are provided.” Id. The Report gave examples of the relevant program offerings: “[I]f a cable subscription music service making transmissions on July 31, 1998, were to offer the same music service through the Internet, then such Internet service would be considered part of a preexisting subscription service.” Id. (emphasis added). But if “a subscription service making transmissions on July 31, 1998, were to offer a new service either in the same or new transmission medium ..., such new service would not quality as a preexisting subscription service.” Id. (emphasis added).
The Report thus makes clear that when Congress acted in 1998 there were only three PSS entities (ie., Muzak, TCI Music, and Digital Cable Radio Associates) and that eligibility for grandfather rates did not extend to altogether new program offerings made by those entities. The Report also makes clear that identifying grandfathered program offerings requires more than consideration of whether an entity’s present transmissions are “noninteractive audio-only subscription digital audio transmissions,” but see Appellee Br. 16-17 *721 (quoting 17 U.S.C. § 114(j)(ll)), because the grandfathered program offerings are limited to those that the entity “made on or before July 31, 1998.” H.R. Conf. Rep. 105-796, at 89. The Report’s use of the phrase “their existing services” necessarily required a comparison to the specific services the entity was offering before July 31, 1998, id. not simply comparison with “noninteractive audio-only subscription digital audio transmissions” in the abstract. 17 U.S.C. § 114(j)(ll). And the examples given show that the entity “must ‘offer the same music service’ as it was offering over cable” in order for that service to be eligible for the grandfather rate. Appellant Reply Br. 13 (quoting H.R. Conf. Rep. 105-796, at 89). The 2006 decision of the Register of Copyrights underscores that PSS eligibility requires not only that the entity (i.e., the “PSS service”) be the same as in 1998, but that the music offering (the programmatic “service”) be the same. See Designation as a Preexisting Subscription Service, 71 Fed. Reg. 64,639, 64,646 (Nov. 3, 2006). It is undisputed that Muzak began offering SonicTap in May 2014, and thus the SonicTap offering does not qualify for the grandfather rate.
In sum, the Conference Report shows how the multiple meanings of the word “service” are to apply to the statutory definition and thereby demonstrates that Muzak’s non-DiSH offerings were not entitled to the grandfather rates. Although the Report is imprecise in any suggestion that entities other than Muzak might be able to pay grandfather rates for transmission over DiSH, see 71 Fed. Reg. at 64,645-46, that imprecision does not mean Muzak is entitled to pay PSS rates for its non-DiSH offerings because the Report’s sole reference to “Muzak” is in its connection with DiSH. Appellant Reply Br. 1-2. My colleagues insist that this is “incorrect” simply because the Report refers to “DiSH Network” rather than to its music offering “DishCD,” Op. at 717 n.ll, without calling into question the more fundamental point: no matter how the Report refers to DiSH, “nowhere did the Report [refer to] Muzak qua Muzak as the relevant PSS.” Appellant Br. 27. Nor do my colleagues offer any support for their claim that “for every point in the conference report supporting SoundExchange, there can be found a countervailing one in support of Muzak,” Op. at 717 n.ll, particularly as regards the passages discussed herein showing Congress’s intent to impose on PSSs a double limitation (same entity and same program-offering).
Especially in light of the conferees’ explanation of the grandfather clause, then, I concur in reversing the dismissal of Soun-dExchange’s complaint.