**Raphael OPHIR, and Boston Taxi Owners Association, Inc.,** Plaintiffs

v.

**CITY OF BOSTON, and Edward Davis, as Commissioner of the Boston Police Department, Defendants.**

**Civil Action No. 09–10467–WGY.**

United States District Court, D. Massachusetts.

Aug. 14, 2009.

Paul H. Merry, Boston, MA, for Plaintiffs.

Helen G. Litsas, Kristina Racek Pechulis, Melissa A. Potvin, Suchita B. Desai, City of Boston Law Department, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

WILLIAM G. YOUNG, District Judge. My ten year old grandson came to watch the motion session where this matter was argued. When it was over, he said, "Why can't Boston do what it wants with its taxis? It's for the environment."

Why indeed?

The answer, Cam, is that the Congress of the United States, pursuing national goals it considers important, has forbidden Boston from taking this initiative on behalf of its citizens.[1]

## I. INTRODUCTION

"A hallmark of environmental federalism is that neither federal nor state governments limit themselves to what many legal scholars have deemed to be their appropriate domains." David Adelman & Kirsten Engel, *Adaptive Federalism: The Case Against Reallocating Environmental Regulatory Authority*, 92 Minn. L.Rev. 1796, 1796 (2008). "The federal government continues to regulate local issues ... which have few direct interstate connections and few benefits from federal uniformity" while state and local governments "are developing policies on environmental issues of national or even international scale, such as global climate change." *Id.* While this Court never hesitates to point out criticism of the Supreme Court's sweeping federal preemption jurisprudence, *see, e.g., Alshrafi v. American Airlines, Inc.*, 321 F.Supp.2d 150, 156 n. 7 (D.Mass.2004), in this case it is a local government that has overstepped its bounds.

In August 2008, the City of Boston ("the city") implemented Boston Police Department Rule 403 ("Rule 403"), which in effect mandates an all hybrid taxi fleet by 2015.[2] Rule 403 provides, in relevant part: "Ev-

---

1. Part of this answer, of course, depends on the fact that these are not "its taxis." They are independently owned but regulated by the City of Boston. If the city owned its own taxi fleet, the answer here might be different. *See* note 11, *infra*.

2. The Court will refer to the pertinent provisions collectively as "the hybrid requirement of Rule 403" or "the hybrid requirement."

ery vehicle put into service as a taxi as of August 29, 2008 shall be a new Clean Taxi vehicle or must have been purchased before August 29, 2008."[3]  Rule 403 [Doc. No. 37 Attach. 1, Exhibit A], Section 3, II(a).  The rule defines "Clean Taxi" as "one that meets efficiency and cleanliness standards as set forth by the Inspector of Carriages and the Commissioner of the City of Boston Environment Department" and is included in a list of "acceptable vehicles" maintained by the Hackney Carriage Unit of the Boston Police Department.[4]  *Id.* Section 3, I(d).  The list currently in effect includes only new hybrid-powered vehicles from the current model year, as did the list in effect last year.  *See* Boston Police Department, Inspector of Carriages Notice 09–02 (Feb. 9, 2009) [Doc. No. 37 Attach. 1, Exhibit B]; Inspector of Carriages Notice 08–05 (Sept. 11, 2008) [Doc. No. 48 Attach. 1]. Because the city requires all taxis owned by multiple-taxi companies to be replaced every six years and those owned by single-medallion[5] holders every seven years, *see* Rule 403, Section 3, III(c)(xvii), enforcement of Rule 403 would result in an entirely hybrid fleet by 2015.  *See* Press Release, Mayor's Office, *Mayor Menino Announces Taxi Fleet to be Fully Hybrid by 2015* (August 29, 2008) [Doc. No. 40 Attach. 9].

On March 27, 2009, Raphael Ophir, owner of several hackney carriage medallions in the city, and the Boston Taxi Owners Association, Inc. ("the Association"), a nonprofit corporation comprised of medallion owners,[6] (collectively, "the taxi operators"), asked this Court for a declaratory judgment that the hybrid requirement of Rule 403 is preempted by the Energy Policy and Conservation Act of 1975 ("EPCA"), 49 U.S.C. §§ 32901 *et seq.,* and the Federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*[7]  *See* Complaint [Doc. No. 1 Attach. 4]. They sought preliminary and permanent injunctive relief from its enforcement, and formally moved for a preliminary injunction on June 2, 2009.  At a hearing on June 5, 2009, this Court, in accordance with its practice pursuant to Federal Rule of Civil Procedure 65(a)(2), combined further hearing on the motion with a trial on the merits and placed the case on its running trial list to commence no earlier than July 6, 2009, without affording the taxi operators any preliminary relief.

On June 15, 2009, the city[8] moved to dismiss the section 1983 claims, the Massachusetts Administrative Procedure Act claim, all claims by the Boston Taxicab Operator's Association, and all claims

---

3.  Rule 403 further provides for increases in allowable fares and rental rates and addresses other aspects of taxicab service, including requiring credit card processing capability. Those provisions are not at issue here.

4.  A "hackney carriage" is a taxi.  *See* Rule 403, Section 1, I(b).

5.  A "medallion" is a license granted to a suitable individual to operate a taxi in the city.  *See* Rule 403, Section 2, I(i).

6.  The suit was brought in the name of the Boston Taxicab Operator's Association, an unincorporated association.  In response to the city's motion to dismiss its claims for lack of capacity to sue, the association registered in the Commonwealth as a nonprofit corpora-

tion, the Boston Taxi Owners Association, Inc.

7.  They further complained that the city promulgated the hybrid requirement in violation of the Massachusetts Administrative Procedure Act, *see* Mass. Gen. Laws chapter 30A, and that the requirement was a Fifth Amendment regulatory taking for which they should be afforded relief (including attorneys' fees and costs) pursuant to 42 U.S.C. § 1983.

8.  While Commissioner Edward Davis is a named defendant in this suit, the Court will refer to the defendants collectively as "the city."

against Davis. *See* City's Motions to Dismiss [Doc. No. 18, 20]. The motions were scheduled to be heard on July 23, 2009. On July 8, 2009, the city moved for partial summary judgment, asking the Court to rule that as matter of law the hybrid requirement was not preempted by federal law.[9] *See* City Memorandum in Support of Partial Summary Judgment ("City Mem.") [Doc. No. 36].

At a hearing on July 23, 2009, the Court preliminarily enjoined the city's enforcement of the hybrid requirement of Rule 403, concluding that the taxi operators had shown they were likely to suffer irreparable harm without such relief and had shown a likelihood of success on the merits.[10]

The city insists that, in promulgating Rule 403, it "gave no consideration to whatever environmental or societal benefits might accompany the use of hybrid vehicles," City Statement of Facts [Doc. No. 37] ¶ 27, and that the rule's "predominating purpose was to modernize and improve the quality and appearance of the Boston taxi fleet." City Mem. In Support [Doc. No. 36] at 9. In this Circuit, however, the focus of the Court's preemption analysis must be on the effects of the challenged regulation rather than its purpose. *See Associated Industries of Massachusetts v. Snow*, 898 F.2d 274, 279 (1st Cir.1990) ("Rather than attempt to divine the Massachusetts Legislature's intent in enacting its . . . legislation, we look instead to the effect of the regulatory scheme."). The Court now turns to that analysis.

## II. ANALYSIS

In response to the energy crisis of 1973, Congress "established a major program to bring about improved motor vehicle fuel efficiency"—the EPCA. *General Motors Corp. v. National Highway Traffic Safety Admin.*, 898 F.2d 165, 167 (D.C.Cir.1990). Pursuant to the EPCA, the Department of Transportation is charged with establishing a system of standards specifying a minimum level of average fuel economy applicable to a manufacturer in a model year. 49 U.S.C. §§ 32901(a)(6); 32902(a), 32902(c). That responsibility has been delegated to the National Highway Traffic Safety Administration ("NHTSA"), 49 C.F.R. § 1.50(f), which must weigh four factors when setting standards: "technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f). Currently, a manufacturer's fleet must average at least 27.5 miles per gallon, 49 U.S.C. § 32902(b). In 2007, Congress increased that standard to 35 miles per gallon beginning with model year 2020. *See* The Energy Independence and Security Act of 2007, Pub.L. No. 110–140, Title I, § 102, 121 Stat. 1492, 1499 (2007). Earlier this year, President Obama announced a new national policy "aimed at both increasing fuel economy and reducing greenhouse gas pollution for all new cars and trucks sold in the United States," which would require an average fuel economy standard of 35.5 mpg even earlier, in 2016. *Press Release, The White House, President Obama Announces National Fuel Efficiency Policy* (May 19, 2009). While its tool may be blunt rather than fine-tuned, there can be no doubt but that the federal government's

---

**9.** By moving for summary judgment on an issue, of course, a party leaves itself open, when there is no genuine issue of material fact, to having a judgment taken against it on

that issue. *See Andrews v. DuBois*, 888 F.Supp. 213, 220–21 (D.Mass.1995).

**10.** Also at the hearing, the taxi operators voluntarily dismissed their section 1983 claims.

concern regarding fuel efficiency is ongoing.

The EPCA expressly preempts local regulations "related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel standard under this chapter." 49 U.S.C. § 32919. The breadth of regulatory activities embodied in the term "related to" recently was addressed by the Southern District of New York in a case with facts strikingly similar to this one, *Metropolitan Taxicab Board of Trade v. City of New York*, No. 08 Civ. 7837(PAC), 2009 WL 1748871 (S.D.N.Y. June 22, 2009) (Crotty, J.). There, in an admitted effort to reduce greenhouse gases and improve air quality, New York City promulgated two sets of regulations pertaining to taxicabs, both of which eventually were preliminarily enjoined by the court. The first set of regulations required all new taxicabs to satisfy a minimum mile-per-gallon rating by a certain date. *Metropolitan Taxicab Bd. Of Trade v. City of New York*, No. 08 Civ. 7838(PAC), 2008 WL 4866021, at *1 (S.D.N.Y. Oct.31, 2008) (Crotty, J.). As the court explained, while the regulations did not require that new taxis have hybrid engines, "the effect of the minimum mpg standard [was] that only cars with hybrid engines or clean diesel engines [could] meet the mileage standard requirement." *Id.* at *2. The court concluded that the plaintiffs were likely to show that the regulations were preempted by the EPCA because "the rules set standards that relate to an average number of miles that New York City taxicabs must travel per gallon of gasoline." *Id.* at *9.

The court, relying on the Supreme Court's decision in *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004), concluded that in order for a state law to be "related to" federal fuel economy standards, it need not "actually interfere" with them. Allowing one municipality to affect fuel economy standards, the court observed, could have an unwanted aggregate affect if other states or municipalities followed suit. 2008 WL 4866021, at *10. The Harvard Law Review recently opined that the decision was "probably correct" in this regard. *See Recent Case, Local Government Law, Preemption*, 122 Harv. L.Rev. 2275, 2279 & n. 41 (June 2009) ("The Court's reasoning in *Engine Manufacturers* seriously undercuts the City's argument that the [regulation] is not 'related to fuel economy standards.' ").[11]

New York City then pursued an alternate strategy: it promulgated a second set of regulations promoting the purchase of hybrid taxis by reducing the rates at which taxicab owners could lease non-hybrid vehicles to drivers. *See* 2009 WL 1748871, at *1. Several plaintiffs from the earlier case filed an amended complaint challenging the new regulations and requesting another preliminary injunction. The court again agreed, concluding that the new regulations were a de facto mandate to buy hybrid taxicabs, and were "related to" fuel economy standards under the EPCA as well as to the control of emissions under the CAA. 2009 WL 1748871, at *3. This time the court relied on *Travelers Indemnity Co. v. Bailey*, —— U.S. ——, 129 S.Ct. 2195, 2203, 174 L.Ed.2d 99 (2009), where,

**11.** The Harvard Law Review disagreed, however, with the court's rejection of New York City's invocation of a savings clause in the EPCA that permits a political subdivision of a state to "prescribe requirements for fuel economy for automobiles obtained for its own use," 49 U.S.C. § 32919(c). *See* 2008 WL 4866021, at *10–11. The Harvard Law Review advocated a broader interpretation of the term "use." *See* 122 Harv. L.Rev. at 2279–82. Here, the city does not press that exemption.

in the context of the enforceability of a Bankruptcy Court order releasing an insurer from any claims "based upon, arising out of or relating to" certain insurance policies, the Supreme Court broadly interpreted the phrase "relating to." In ruling that the disputed actions against the insurer were enjoined, the Supreme Court, relying on *Smith v. United States,* 508 U.S. 223, 237–38, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993),[12] noted that "[i]n a statute, the phrase 'in relation to' is expansive," and interpreted it in a similarly expansive manner with respect to the order. *Travelers Indemnity Co.,* 129 S.Ct. at 2203.

■ As this Court finds the *Metropolitan Taxicab* decisions persuasive and well-reasoned, the city has a long row to hoe. While the hybrid requirement of Rule 403 does not explicitly require a minimum fuel economy, as did the first set of New York City regulations, it imposes a requirement more stringent, at least technically, than the second set. Therefore, as the taxi operators pointed out at oral argument, a significant issue in the 2009 decision— whether the regulations were a de facto mandate to purchase hybrid vehicles—is not present here. Still, the city gainsays the persuasiveness of the 2009 *Metropolitan Taxicab* decision in several respects, which the Court will now address.

■ First, the city contends that the decision failed "to recognize the well-established presumption against preemption." City Mem. at 14. While the city is correct that the presumption exists even where Congress has spoken expressly about preemption, *see Altria Group, Inc. v. Good,* — U.S. ——, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008) ("when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption'" (quoting *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005))),[13] it has not shown that in passing the EPCA, Congress legislated in a field traditionally occupied by the states. *Id.* at 543 ("When addressing questions of express or implied pre-emption, we begin our analysis 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947))). The presumption is not triggered when a state regulates in an area "where there has been a history of significant federal presence." *United States v. Locke,* 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) (refusing to apply presumption in favor of state laws bearing upon national and international maritime commerce).[14] While there is no

---

**12.** *Smith v. United States,* 508 U.S. 223, 237–38, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) involved a conviction for use of a firearm "in relation to" a drug trafficking offense, 18 U.S.C. § 924(c)(1).

**13.** Justice Thomas, in dissent, joined by Chief Justice Roberts and Justices Scalia and Alito, attacked the majority's reliance on a presumption against preemption, concluding that "[i]n light of *Riegel* [*v. Medtronic, Inc.,* 552 U.S. 312, 128 S.Ct. 999, 169 L.Ed.2d 892 (2008)], there is no authority for invoking the presumption against pre-emption in express

pre-emption cases." *Altria Group, Inc.,* 129 S.Ct. at 558 (Thomas, J., dissenting).

**14.** This precedent may have been brought into question by the Supreme Court's recent decision in *Wyeth v. Levine,* — U.S. ——, —— n. 3, 129 S.Ct. 1187, 1195 n. 3, 173 L.Ed.2d 51 (2009), where the Court concluded over the objection of a pharmaceutical company that a state failure-to-warn jury verdict was entitled to the presumption even though the federal government had regulated drug labeling for more than a century. *Wyeth,* however, involved matters (health and

doubt but that regulation of taxis is traditionally a local matter, the hybrid requirement of Rule 403 regulates in an area of significant federal presence—fuel economy.

The city next takes exception to the *Metropolitan Taxicab* court's reliance on the Supreme Court's analysis of "relate to" in *Travelers Indemnity Co.*, calling it "misplaced." City Mem. at 14.[15] Instead, the city contends, the court should have referred to cases interpreting the term "relate to" in the preemption context, for example, those involving the preemption provision of the Employment Retirement Income Security Act (ERISA). *See* City Mem. at 14–15.

ERISA expressly supersedes state laws that "relate to" employee benefit plans. 29 U.S.C. § 1144(a). As this Court has explained in great detail, *see Miara v. First Allmerica Financial Life Insurance*

*Co.*, 379 F.Supp.2d 20, 31 (D.Mass.2005), its preemptive scope initially was interpreted expansively by the Supreme Court. In *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Court, referring to Black's Law Dictionary, concluded that a state law claim "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Id.* at 96–97 & n. 16, 103 S.Ct. 2890; *see* Black's Law Dictionary 1158 (5th ed.1979) ("Relate. To stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with."). Later, "recognizing the existing obfuscation" caused by that standard, the Supreme Court "narrowed its 'relate to' jurisprudence in *Travelers* and its progeny," and announced a new "pragmatic approach." *Miara,* 379 F.Supp.2d at 32 (citing *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115

safety) in which the state undoubtedly had a historic presence.

15.  The city further points to a decision by the Eastern District of California addressing the scope of the preemption provision of the EPCA, contending that it indicates that the term relating to "should not be interpreted as expansively as Plaintiffs propose." City Mem. at 9. Challenged in *Central Valley Chrysler–Jeep, Inc. v. Goldstene*, 529 F.Supp.2d 1151, 1175 (E.D.Cal.2007) were regulations setting limits on carbon dioxide emissions for cars and certain trucks used in California. After accepting for purposes of its analysis that the implementation of the regulations would necessarily require substantial increases in fuel efficiency, the court concluded that the regulations nonetheless were not expressly preempted by the EPCA. It construed EPCA's preemptive scope "as narrowly as the plain language of the law permits," concluding that it "encompasses only those state regulations that are explicitly aimed at the establishment of fuel economy standards, or that are the de facto equivalent of mileage regulation, or that do not meet the requirements established by the Clean Air Act for waiver of preemption under section 209."

Central Valley, however, involved a *California* regulation. That is significant because, pursuant to the Clean Air Act, California may receive a waiver from the Environmental Protection Agency to impose standards more stringent than the Clean Air Act requires. 42 U.S.C. § 7543(b)(1). In contrast, other states only may adopt standards that are promulgated by California and for which waiver of preemption has been granted. 42 U.S.C. § 7507. In narrowly construing the EPCA's preemptive scope, the court in *Central Valley* cited, inter alia, the following considerations: Congress did not intend that the EPCA would supercede regulation of pollution emissions already in place in California (it was the only state that had done so before the EPCA was enacted) and the EPCA requires the NHTSA to consider "other motor vehicle standards of the government," which included any regulation receiving a waiver of preemption under the Clean Air Act. Because *Central Valley* involved a regulation that was eligible for a waiver pursuant to the Clean Air Act, and therefore had the potential to be treated as equivalent to an EPA standard, it involved circumstances quite distinct from this case.

S.Ct. 1671, 131 L.Ed.2d 695 (1995)). It instructed courts to begin "with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs." *Travelers*, 514 U.S. at 655, 115 S.Ct. 1671. In other words, look "beyond the unhelpful text" to the "objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656, 115 S.Ct. 1671. As demonstrated below, even when the Court applies the same approach here, the city does not prevail.

When Congress passed the EPCA, it observed that "[t]he fundamental reality is that this nation has entered a new era in which energy resources previously abundant, will remain in short supply, retarding our economic growth and necessitating an alteration in our life's habits and expectations." *See* H.R.Rep. No. 94–340, at 1–3 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762, 1763. The goals of the EPCA in the short term were "to reduce the vulnerability of the domestic economy to increases in import prices, and to insure that available supplies will be distributed equitably in the event of a disruption in petroleum imports." S.Rep. No. 94–516, at 117 (1975) (Conf.Rep.), *reprinted in* 1975 U.S.C.C.A.N.1956, 1957. Over the long term, the EPCA was designed to "decrease dependence upon foreign imports, enhance national security, achieve the efficient utilization of scarce resources, and guarantee the availability of domestic energy supplies at prices consumers can afford." *Id.*

This Court's efforts to unearth revelations in the legislative history about the scope of EPCA's preemption provision have availed little, as they did for another district court examining the same provision. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508

F.Supp.2d 295, 354 (D.Vt.2007) ("The Committee reports accompanying the bill that became EPCA contained no discussion of the intended scope of the preemption clause."). One article by attorneys representing segments of the automobile industry points out that Congress rejected more limited forms of preemption, citing this as evidence that Congress "intended the EPCA to preempt broadly all state and local regulation in the area of fuel economy." Raymond Ludwiszewski & Charles Haake, *Cars, Carbon, and Climate Change*, 102 NW. U.L.Rev. 665, 689 (2008) ("The original Senate bill for the EPCA would have preempted state laws only if they were 'inconsistent' with the federal fuel economy standards contained in the Act. Similarly, the House bill would have preempted state laws only if they were not 'identical to' a federal requirement.").

A kernel of insight into the objectives of the EPCA as they pertain to this case may be found in a pertinent House Report, which recognizes that "the automobile industry has a central role in our national economy and that any regulatory program must be carefully drafted so as to require of the industry what is attainable without either imposing impossible burdens on it or unduly limiting consumer choice as to capacity and performance of motor vehicles." H.R.Rep. No. 94–340, at 87 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762, 1849. This statement reveals that while the primary focus of the EPCA was to regulate the country's consumption of energy resources, Congress intended that passage of the EPCA would not unnecessarily restrict purchase options. Further support may be found in Congress' instruction that the NHTSA consider "economic practicability" when setting fuel economy standards, 49 U.S.C. § 32902(f), which the NHTSA has interpreted to mean that standards should not be so stringent as to create "adverse economic consequences,

such as a significant loss of jobs or the unreasonable elimination of consumer choice." NHTSA Proposed Rules, 67 FR 77015–01, 77021 (December 16, 2002). While the hybrid requirement of Rule 403 restricts the choice only of a certain class of purchasers—the taxi operators—as the Supreme Court explained in *Engine Manufacturers,* "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." 124 S.Ct. at 1762.

Lest the Court give the impression that it has scoured the legislative history with a particular result in mind, it emphasizes that it "must give effect to [the] plain language [of the preemption provision] unless there is good reason to believe Congress intended the language to have some more restrictive meaning." *Shaw,* 463 U.S. at 97, 103 S.Ct. 2890. Where the plain meaning of the term "related to" is broad and the legislative history reveals, if anything, only support for the position that Congress intended it to be so, the Court may not interpret it otherwise. Furthermore, there is no doubt but that had Congress intended the EPCA to preempt only narrowly, it would have drafted the act to have that effect. *See, e.g.,* 49 U.S.C. § 30103 ("When a motor vehicle safety standard is in effect under this chapter, a State or a political subdivision of a State may prescribe or continue in effect a standard applicable to the same aspect of performance of a motor vehicle or motor vehicle equipment only if the standard is identical to the standard prescribed under this chapter.").

Having addressed the merits of the case, only the following need be said about the city's motions to dismiss: 1) the motion pertaining to the Massachusetts Administrative Procedure Act and section 1983 claims [Doc. No. 20] is moot; 2) while it is unclear whether the city presses its objection to the standing of the Boston Taxi Owners Association, Inc., even were the Association dismissed from the case, Ophir's standing has not been challenged; and 3) the city's motion to dismiss the claims against Davis [Doc. No. 18] is denied because, as the taxi operators point out, "official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (quoting *Kentucky v. Graham,* 473 U.S. 159, 167, n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

### III. CONCLUSION

For the reasons above, the city's motion for partial summary judgment [Doc. No. 35] is denied. The Court declares instead that the hybrid requirement of Rule 403 is expressly preempted by the EPCA, and the city and Davis are permanently enjoined from enforcing it.

SO ORDERED.