ASSOCIATION OF TAXICAB OPERATORS, USA,
Plaintiff,

v.

CITY OF DALLAS, Defendant.

Civil No. 3:10–CV–769–K.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 30, 2010.

Kelly Dean Hollingsworth, John W. Bryant, Glast Phillips & Murray, Dallas, TX, for Plaintiff.

Christopher J. Caso, Lemuel B. Thomas, Dallas City Attorney's Office, Dallas, TX, for Defendant.

## PRELIMINARY INJUNCTION ORDER

ED KINKEADE, District Judge.

Before the Court is Plaintiff Association of Taxicab Operators, USA's ("Plaintiff" or "ATO") Verified Complaint, which requests a preliminary injunction order against Defendant City of Dallas ("Defendant" or the "City"). After considering the Verified Complaint, the Memorandum of Law Supporting Temporary Restraining Order and Preliminary Injunction, the City's Response, ATO's Reply, and the evidence submitted at the Court's preliminary injunction hearing, the Court is of the opinion that ATO cannot establish likelihood of success on the merits because ATO fails to demonstrate the ordinance passed by the City is an emissions standard under the Clean Air Act and thus is preempted by federal law, therefore, the preliminary injunction order requested therein should be and is hereby **DENIED.** The Court's decision concerning the preliminary injunction is not a decision on the merits of the underlying case, and the following findings of fact and conclusions of law are not binding at a trial on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

### I. Findings of Fact

1. Plaintiff ATO is a Texas non-profit corporation with its principal place of business in Dallas, Texas. ATO is a membership organization that represents all taxicab drivers licensed to operate in Dallas, Texas. Compl. ¶ 3.

2. Defendant City of Dallas is an incorporated city in the state of Texas that acts through its city counsel to adopt ordinances. Compl. ¶ 4.

3. Dallas Love Field ("Love Field") is owned and operated by the City.

4. The nine-county Dallas–Fort Worth ("DFW") region has been designated a nonattainment area with respect to the Environmental Protection Agency ("EPA") standards for ground-level ozone pursuant to the Clean Air Act. *See generally,* Clean Air Act § 181, 42 U.S.C. § 7511. The DFW region's designation as a nonattainment area requires that a State Implementation Plan ("SIP") be submitted to the EPA with the goal of bringing the DFW region into compliance with the ozone standard. *Id.* If the DFW region fails to come into compliance with the ground-level ozone standard, as required by the Clean Air Act and the SIP, the consequences may be severe, including, the loss of federal highway funding and other funds. *See* Clean Air Act § 179, 42 U.S.C. § 7509. Moreover, the EPA has proposed to strengthen the ground-level ozone standard, making it even more difficult for the DFW region to come into compliance. Federal Register of January 19, 2010 at 75 FR 2938.

5. Emissions from mobile sources, including motor vehicles, make up approximately seventy-three percent (73%) of the ozone-causing pollution in the DFW region. Thus, the City determined that providing incentives for low-emissions vehicles was a necessary component of the City's efforts to help bring the DFW region into compliance.

6. On March 10, 2010, the City adopted Ordinance No. 27831 (the "Ordinance"), with an effective date of April 10, 2010. The Ordinance amended Sections 5–58 and 5–59, and added a new Section 5–61.1, to Chapter 5 of the Dallas City Code entitled "Aircraft and Airports." The Ordinance creates an incentive for a taxicab designated as a "dedicated compressed natural gas vehicle" ("CNG taxicab").

7. A CNG taxicab is defined in the Ordinance as "a vehicle that operates exclusively on compressed natural gas." Dallas City Code, § 5–58(9). A taxicab owner can either purchase a new vehicle that is already equipped with a compressed natural gas system or can convert an existing cab to operate on compressed natural gas. "Head-of-the-line" privileges are issued to CNG taxicabs, which means that if a CNG taxicab has been issued an emblem by the City's Director of Aviation, and is otherwise permitted by the City, then it is entitled to advance to the front of the taxicab holding or dispatch area at Love Field ahead of non-CNG taxicabs who may be waiting to pick up passengers at the Airport. Dallas City Code, § 5–61.1.

8. The Ordinance does not apply to any property or areas located within the City outside of Love Field. At Love Field, non-CNG taxicabs are free to drop-off passengers without having to wait in the central holding area because the Ordinance only applies to taxicabs picking-up passengers at the airport. Moreover, if a taxicab driver has made prior arrangements to pick-up a passenger the system of waiting in line at a central queue likewise does not apply.

9. ATO asserts that a substantial number of its members are affected by the Ordinance. Compl. ¶ 7. Currently, there are about eight to ten taxicabs operating out of Love Field that are CNG equipped vehicles. Compl. ¶ 13. Any taxicab operator owning a non-CNG taxicab is subject to being by-passed by drivers at Love Field who have CNG vehicles, which means non-CNG drivers lose about two to three trips a day. Compl. ¶ 13.

10. ATO's articles of incorporation's stated purpose is "to defense [sic] and promote the interest of taxicab operators in the greater Dallas and fort [sic] Worth area." Compl. ¶ 8. Pursuant to the stated purpose in its articles of incorporation, on April 15, 2010, ATO filed its Original Veri-

fied Complaint against the City alleging the City's actions are preempted by the Clean Air Act. ATO asserts the CNG preference is a "standard relating to the control of emissions from new motor vehicles." See Clean Air Act § 209(a), 42 U.S.C. § 7543(a). Thus, according to ATO, the City's regulation is preempted by Section 209(a) of the Clean Air Act, which states: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." Id.

11. This Court entered a temporary restraining order ("TRO") on April 15, 2010, enjoining the City from allowing taxicabs at Love Field which utilize dedicated CNG powered engines to be given "head-of-the-line" privileges at any taxicab holding or dispatch area.

12. A preliminary injunction hearing was held on May 4, 2010. Counsel on behalf of both ATO and the City appeared before the Court. ATO seeks the injunction to prevent the City from enforcing the "head-of-the-line" privileges for CNG powered engines at Dallas Love Field.

13. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

14. ATO moves for a preliminary injunction under Fed.R.Civ.P. 65.

## II. Conclusions of Law

■ To obtain a preliminary injunction, plaintiff must show (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the pre-

liminary injunction will not disserve the public interest. See Harris Cnty. v. CarMax Auto Superstores, Inc., 177 F.3d 306, 312 (5th Cir.1999); Miss. Power & Light Co. v. United Gas Pipe Line, 760 F.2d 618, 621 (5th Cir.1985). The decision to grant or deny a preliminary injunction is left to the sound discretion of the district court. A preliminary injunction is an extraordinary remedy which should only be granted if the movant has clearly carried his burden of persuasion on all of the four factors. Miss. Power & Light, 760 F.2d at 621. Applying the factors, the Court has determined that ATO is not entitled to preliminary injunctive relief.

### A. Likelihood of Success on the Merits

■ The first factor, a showing of a substantial likelihood of success on the merits, does not require that the movant prove his case. Lakedreams v. Taylor, 932 F.2d 1103, 1109 n. 11 (5th Cir.1991). Even some likelihood of success can be enough to support the issuance of a preliminary injunction. See Productos Carnic, S.A. v. Cent. Am. Beef and Seafood Trading Co., 621 F.2d 683, 686 (5th Cir. 1980) ("Where the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief.").

### 1. Preemption Under the Clean Air Act

ATO alleges the City's Ordinance is preempted by the Clean Air Act. ATO argues that Section 209(a) of the Clean Air Act restricts the City from enforcing its Ordinance. Section 209(a) states: "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42

U.S.C. § 7543(a). ATO relies on *Metro. Taxicab Bd. of Trade v. City of New York* ("*Metro. Taxicab*"), to argue that the Ordinance effectively forces ATO to purchase CNG powered taxicabs, and that the Ordinance is a "standard relating to the control of emissions from new motor vehicles." 633 F.Supp.2d 83, 105 (S.D.N.Y.2009); *see* 42 U.S.C. § 7543(a).

The issue in this case is whether the City has adopted or enforced regulations of the type that Congress sought to preempt under the Clean Air Act. "In all preemption cases, and particularly in those in which Congress has legislated ... in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citation and internal quotation marks omitted).

The particular issue here is whether the City is enforcing a standard within the meaning of Section 209(a). In undertaking this analysis, "Congressional purpose is the 'ultimate touchstone' of our inquiry." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)). When Congress enacted the Clean Air Act in 1963, major metropolitan areas such as Dallas had pervasively regulated taxicabs for several decades. *See, e.g.,* Mark W. Frankena and Paul A. Pautler, An Economic Analysis of Taxicab Regulation at 15 (FTC Bureau of Economics Staff Report May 1984) ("[s]ince about 1930 the taxicab industry has been characterized by pervasive government regulation"). Comprehensive local regulation of taxicabs has continued in the decades following the statute's enactment. *See e.g.,* Robert Hardaway, Taxi and Limousines: the Last Bastion of Economic Regulation, 21 Hamline J. Pub. L. & Pol'y 319 (2000); Paul S. Dempsey, Taxi Industry Regulation, Deregulation & Reregulation: the Paradox of Market Failure, 24 Transp. L.J. 73 (1996). As the Supreme Court noted in 1952, "[t]he operation of taxicabs is a local business," and "Congress has left the field largely to the states." *Buck v. People of State of Cal.*, 343 U.S. 99, 102, 72 S.Ct. 502, 96 L.Ed. 775 (1952). Neither before or since the enactment of the Clean Air Act has Congress sought to bring the taxicab industry under federal regulatory control.

Specifically, Texas state law authorizes cities such as Dallas to regulate taxicabs and the Dallas City Charter grants the City the authority to regulate vehicles for hire and also permits the City to grant franchises to those companies using its streets and roadways. Tex. Loc. Gov't Code § 215.004; *see* Dallas City Charter § 13; Dallas City Charter Ch. XIV. Dallas regulates the taxicab industry through Chapter 45 of the Dallas City Code and has regulated taxicabs for decades.

Even looking at the broader automobile industry, Section 209(d) preserves state and local authority over use and operations of vehicles. 42 U.S.C. § 7543(d). As the D.C. Circuit has observed, "the longstanding scheme of motor vehicle emissions control has always permitted the states to adopt in-use regulations—such as carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles—that are expressly intended to control emissions." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1094 (D.C.Cir.1996). Here, the City has created an incentive for taxicabs to use CNG powered engines to reduce problems such as "smog, haze, and health issues." Dallas Ordinance No. 27831.

In enacting Section 209, Congress was careful to distinguish between state and local measures governing the use of automobiles (even outside the scope of the closely regulated taxicab industry) and measures that would regulate emissions characteristics of new vehicles in a way that would effectively mandate manufacture of a distinct type of vehicle. Congress was at pains to make clear that only the latter type of measures fall within the express statutory preemption provision. As the Senate Report explained, the statute provides "for Federal preemption of the right to set standards on new motor vehicles and new motor vehicle engines only," while including "[s]pecific language indicating the committee's position on the rights of the States to control the movement, operation, and use of licensed or registered vehicles." S.Rep. No. 90–403, at 34 (1967). As the report emphasized, "[t]his language is of particular importance," noting that "any significant advance in control of used vehicles would result in a corresponding reduction in air pollution," and that "[t]hese are areas in which the States and local government can be most effective." *Id.*; *see also* H.R.Rep. No. 90–728, reprinted in 1967 U.S.C.C.A.N. 1938, 1957 (discussing what is now Section 209 of the Clean Air Act and noting that "[t]he ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance so as to permit economies in production," indicating the limited function of this provision); 42 U.S.C. § 7401(a)(3) (finding that "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments").

This is consistent with the structure of the Clean Air Act as a whole, which largely preserves the traditional role of states in controlling air pollution. *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1042 (9th Cir.2007); *see Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power"); *see also Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F.Supp.2d 295, 350 (D.Vt.2007) ("Congress acknowledged that the regulation of air pollution from mobile sources was traditionally a state responsibility."). Section 209 of the Clean Air Act only intends to assure national uniformity of standards for manufacturers—here, tailpipe emissions.

### 2. Meaning of "Standard" Under Section 209(a)

To conclude that the Ordinance is preempted would also require an expansion of Section 209(a) beyond its focus on enforceable standards of the type contemplated by the statute. As the Supreme Court noted in *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252–53, 255, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004), in interpreting the scope of Section 209(a), due weight must be given to the provision's use of the phrase "attempt to enforce" and its implications for the meaning of "standard." The Court in that case rejected the contention that the Clean Air Act preempts enforceable restrictions on vehicle sales, but not restrictions on vehicle purchases. The Court reasoned that "[a] command, accompanied by sanctions, that certain purchasers may buy only vehicles with particular emission characteristics is as much an 'attempt to enforce' a 'standard' as a com-

mand, accompanied by sanctions, that a certain percentage of a manufacturer's sales volume must consist of such vehicles." *Id.* at 255, 124 S.Ct. 1756. As the Court stressed, that reasoning did not require the conclusion that Section 209(a) preempts "voluntary incentive programs," explaining that "[i]t is at least arguable that the phrase 'adopt or attempt to enforce any standard' refers only to standards that are enforceable." *Id.* at 258, 124 S.Ct. 1756.

■ As is readily apparent from the Supreme Court's discussion of the enforcement of "standards" in *Engine Mfrs.,* Congress used those terms throughout Title II to refer to enforceable requirements to manufacture vehicles with particular kinds of emission controls or vehicles that meet particular emissions levels, or enforceable requirements on purchasers that accomplish this same end. Where a regulation "neither dictates permissible pollutant levels nor mandates emission control technology," it is not a "standard" under Section 209 of the Clean Air Act. *See Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.,* No. CV F 07–0820 LJO DLB, 2008 WL 4330449, at *12–13, 2008 U.S. Dist. LEXIS 70931, at *35 (E.D.Cal. Sept. 18, 2008).

Here, the only enforceable requirement addresses taxicab ques, a topic that has been traditionally regulated heavily by municipalities. This interpretation is reinforced by Congress's inclusion of the phrase "attempt to enforce" in Section 209(a). An incentive program like the Ordinance, unlike a command to purchase or manufacture vehicles with particular kinds of emission controls, is not an enforceable requirement with respect to emissions. Taxicab owners and drivers can still choose what type of vehicle to use and are not bound by the Ordinance anywhere in the City, except at Love Field. The Ordi-

nance is ultimately incentive-based, even though the Ordinance is legally enforceable.

### 3. Incentives Versus "Standards Relating to Control of Emissions"

Moreover, even if the Ordinance was construed to require the purchase of CNG taxicabs, the Ordinance does not establish "standards relating to the control of emissions," which are the words of Congress in Section 209(a) that would trigger preemption. A mandate to purchase CNG taxicabs would require the use of a particular technology, but the use of this technology does not establish a standard relating to the control of emissions. Simply put, on the facts in this case, there is no evidence that CNG technology establishes an air emissions standard such that Clean Air Act preemption would apply.

By their very nature, incentive programs lack the kind of enforceable requirements that are characteristic of standards. The Ordinance is no different. The Ordinance does not mandate quantitative emissions levels, establish manufacturer requirements, establish purchase requirements, mandate emissions control technology, or establish a penalty or fee system, therefore the Ordinance is not a standard under Section 209(a) of the Clean Air Act.

### 4. Incentives are Distinguished in *Metro Taxicab* Case

Additionally, ATO's reliance on *Metro. Taxicab Bd. of Trade v. City of New York* is misplaced. The present case is inapposite to *Metro. Taxicab,* because in that case the City of New York's regulation differs from the Ordinance in the lawsuit before this Court. In *Metro. Taxicab,* New York passed rules affecting a taxicab driver's lease rates. 633 F.Supp.2d 83, 85 (S.D.N.Y.2009). Under the new rules, if an

owner purchased a taxicab with a hybrid or clean-diesel engine, the rate at which the vehicle could be leased to a driver for a twelve-hour shift is increased by three dollars. *Id.* By contrast, an owner's maximum lease rate that could be charged for other taxicab vehicles (non-hybrid, non-clean diesel engine, non-wheel chair accessible) was reduced by four dollars in May 2009, then by eight dollars in May 2010, and twelve dollars in May 2011. *Id.* Importantly, the court in *Metro. Taxicab* explicitly pointed out "what this case is *not* about." *Id.* at 87 (emphasis added). The court stated:

> Nor is there a question whether New York City can incentivize the purchase of certain types of taxicabs. Several years ago the City issued new taxi medallions which were limited to hybrid vehicles. *See* N.Y. City Administrative Code § 19–532(b) (2003). There was no challenge to the incentive. Recently the City extended the service life of hybrid vehicles from three to five years. *Id.* § 19–535(b)(2006). Again, there was no challenge to this incentive. Similarly, in the present case, Plaintiffs do not challenge the $3 per shift "incentive" increase in lease rates for hybrid taxicabs.

*Id.* at 87. The Second Circuit on appeal, not only affirmed the district court's ruling in *Metro. Taxicab*, but also the district court's statement of what the case is not about. *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 155 (2d Cir.2010) ("[f]or obvious reasons, the plaintiffs did not challenge the $3 upward adjustment of the lease caps for hybrid taxis, which benefitted them").

There is no question the present case is distinguishable from *Metro. Taxicab* because the Ordinance operates as an incentive. Here, taxicabs with CNG powered engines are rewarded with head-of-the-line privileges. An incentive, like the one in this case, was never challenged in *Metro. Taxicab*. Therefore, any reliance on *Metro. Taxicab* is not appropriate, because the present issue was not before the Southern District of New York or the Second Circuit. Furthermore, in *Metro. Taxicab*, the rules at issue were citywide. *See generally, Metro. Taxicab*, 633 F.Supp.2d 83. Every taxicab operating in the city of New York was affected by the regulation. *See id.* In contrast, the Ordinance at issue in the present case only applies to taxicabs operating at Love Field, not elsewhere in Dallas.

### 5. Summary of Reasons for No Preemption

In sum, to find preemption in this case, it would be necessary to conclude: (1) that Congress intended to preempt the key aspects of local regulation of taxi service by municipalities, which have long dictated vehicle requirements with a consequent impact on emissions; (2) that Congress meant to preempt local control of the taxicab industry despite the Clean Air Act authorizing local regulations to reduce vehicle emissions and even though the Clean Air Act regulates the purchase and sale of new vehicles to assure uniformity of standards of manufacturers; (3) that Congress intended preemption despite the strong evidence of Congressional intent to preserve broad State and local authority over use and operation of vehicles; and (4) that regulating taxicab holding and dispatch areas for taxi service constitutes enforcement of standards of the kind contemplated by the Clean Air Act, notwithstanding the strong indications that Congress did not intend to preempt incentive programs under Section 209. For the reasons discussed, ATO's preemption argument fails at each of these steps.

### III. Conclusion

For the aforementioned reasons, because Plaintiff Association of Taxicab Op-

erators, USA cannot establish likelihood of success on the merits—a requisite element to the issuance of a preliminary injunction—Plaintiff's application for a preliminary injunction is **DENIED.**

**SO ORDERED.**