# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 13, 2013

No. 12-10470

Lyle W. Cayce
Clerk

ASSOCIATION OF TAXICAB OPERATORS USA,

Plaintiff–Appellant

v.

CITY OF DALLAS,

Defendant–Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before JONES, DENNIS, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

The City of Dallas, Texas ("Dallas" or the "City") enacted an ordinance offering taxicabs certified to run on compressed natural gas ("CNG") a "head-of-the-line" privilege at a municipally-owned airport, Love Field. The measure permits certified CNG-fueled taxicabs to "cut" ahead of gasoline-powered taxis in the queue for soliciting passengers at Love Field. The Association of Taxicab Operators, USA ("ATO"), which represents cab operators in the Dallas and Fort Worth area, sued, claiming the ordinance is preempted by the Clean Air Act, 42

No. 12-10470

U.S.C. § 7543(a).  Finding the ordinance is not preempted, we AFFIRM the district court's summary judgment for the City.

## FACTS AND PROCEEDINGS

In March 2010, Dallas passed Ordinance 27831, establishing "an incentive program that promotes the use of [CNG] in taxicabs authorized to operate at Dallas Love Field."  Ordinance 27831's preamble states that Dallas and Tarrant Counties are nonattainment areas for ozone.[1]  It further specifies that vehicles powered by CNG emit fewer air pollutants than traditional vehicles.[2]  By its operative provisions, Ordinance 27831 amended Dallas's City Code to grant a "head-of-the-line" privilege to CNG-powered taxicabs that collect passengers at Love Field, an airport owned by the City.  A "taxicab verified as a dedicated [CNG] vehicle" is entitled "to advance to the front of a taxicab holding or dispatch area, ahead of all ineligible taxicabs . . . ."  As implemented, the head-of-the-line privilege only applies to cabs making unscheduled pick ups of passengers at Love Field.  Taxicabs may deposit passengers at Love Field or arrive for a prearranged pick up without priority based on CNG status.  The City grants no head-of-the-line privilege to taxis, CNG-fueled or otherwise, anywhere else within its limits.

The law defines a "dedicated [CNG] vehicle" as "a vehicle that operates exclusively on [CNG]."  The owner or operator of a dedicated CNG vehicle wishing to exercise the head-of-the-line privilege first must apply to Dallas's Director of Aviation, submitting: (1) a name, address, and telephone number; (2) a description of the cab; (3) proof either that the vehicle was "equipped by the

---

[1] Ozone nonattainment areas are "areas whose ozone levels currently exceed the maximum level permitted by" the National Ambient Air Quality Standards promulgated under the Clean Air Act. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 476 (2001); *see* 42 U.S.C. § 7407(d)(1).

[2] According to a Dallas Environmental Coordinator, a CNG vehicle emits approximately seventy percent fewer ozone-generating pollutants than a gasoline vehicle.

original manufacturer with an engine exclusively powered by [CNG] and has remained unaltered," or that the cab was "converted to be equipped with an engine exclusively powered by [CNG], and the conversion was in compliance with" federal regulations; and (4) "[a]ny other information . . . reasonably necessary to determine whether" the cab runs exclusively on CNG. The Director of Aviation issues all successful applicants—hereinafter called "CNG cabs"—a nontransferable emblem or sticker identifying the cab as a CNG cab. Ordinance 27831 also authorizes a criminal penalty of up to $500 for a conviction for "violating a provision of this ordinance."

Ordinance 27831 took effect on April 10, 2010. Five days later, ATO filed suit in the United States District Court for the Northern District of Texas, seeking a declaratory judgment that Ordinance 27831 is preempted by § 209(a) of the Clean Air Act, 42 U.S.C. § 7543(a), which in relevant part preempts "any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part," § 7543(a).[3] ATO also requested a permanent injunction barring enforcement of the head-of-the-line privilege for CNG cabs. ATO moved immediately for a temporary restraining order ("TRO") and a preliminary injunction against the law. The district court granted a TRO, halting enforcement of Ordinance 27831 initially. However, the district court denied the request for a preliminary injunction several months later, after conducting an evidentiary hearing. In its preliminary injunction order, the district court determined ATO had not demonstrated a likelihood of successfully showing that § 209(a) preempts Ordinance 27831. The court cited the long history of state and local taxicab regulation, as well as Congress's determination to exempt from preemption local air pollution control measures focused on the

---

[3] Dallas taxicab companies relying on Ordinance 27831 to invest substantial sums in developing a CNG fleet to operate at Love Field—namely, Irving Holdings, Inc. and Yellow Checker Cab Companies—later intervened as defendants in support of Dallas.

use of vehicles. It further found that Ordinance 27831, an incentive program that changes only the order of operations in Love Field taxi dispatching, was not an enforceable "standard relating to the control of emissions" implicated by § 209(a)'s express preemption provision. After the district court's denial of preliminary injunctive relief, Dallas resumed implementation of Ordinance 27831.[4]

In August 2011, the City filed a motion for summary judgment on all of ATO's claims. In its response, ATO relied in part on affidavits from drivers of gasoline-powered cabs who solicited fares primarily at Love Field to illustrate the negative consequences of Ordinance 27831. The statements were taken in November 2010. The driver-affiants reported the head-of-the-line privilege had led to a rise in the number of CNG cabs servicing Love Field and had slashed business by as much as fifty percent for traditional cabs. By one ATO-member driver's count, forty-six CNG cabs operated at Love Field.[5] As a result, they reported, some drivers of gasoline-powered taxicabs worked longer hours to make ends meet and were forced to weigh the expense of purchasing a CNG vehicle against the prospect of giving up their work altogether.

Still, the parties do not dispute, Love Field is hardly the only route open to cab drivers in Dallas. ATO's Chairman of the Board stated that as of May 2010 there were approximately 2800 taxicabs in Dallas, and only between 150 and 200 of them regularly operated at Love Field. Similarly, Dallas's

---

[4] ATO appealed the denial of preliminary injunctive relief to this court. ATO did not timely file its brief and record excerpts, and the clerk entered an order dismissing the appeal under Fifth Circuit Rule 42.3 for want of prosecution. During the pendency of that appeal, ATO filed a second motion for a TRO and preliminary injunction. The district court denied the motion without prejudice, citing its lack of jurisdiction over the case during ATO's appeal.

[5] Dallas's Transportation Regulation Manager specified that forty-three CNG cabs were authorized to operate in Dallas as of April 2010. ATO maintains, but without citation to record evidence, that the number of CNG cabs at Love Field grew subsequently to almost ninety.

No. 12-10470

Transportation Regulation Manager reported that in February 2010 there were 2022 cabs authorized to operate in Dallas and 1805 drivers with taxicab licenses.

The district court found no genuine issue of material fact appropriate for trial, granted Dallas's motion, and rendered final judgment on nearly identical grounds as in its preliminary injunction order.  ATO appealed.

## STANDARD OF REVIEW

We review the district court's summary judgment de novo and apply the same standard as the district court.  *Dameware Dev., L.L.C. v. Am. Gen. Life Ins. Co.*, 688 F.3d 203, 206 (5th Cir. 2012).  We may grant summary judgment if the record, viewed in the light most favorable to the nonmovant, "demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *United States v. Renda*, 709 F.3d 472, 478 (5th Cir. 2013); *see* FED. R. CIV. P. 56(a).  A dispute gives rise to a genuine issue of material fact if the evidence permits a reasonable jury to rule in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]onclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). We require "the party opposing the summary judgment . . . to identify specific evidence in the record and to articulate precisely how this evidence supports his claim." *Id.*

## DISCUSSION

ATO argues the Clean Air Act, in § 209(a), preempts Dallas from imposing the head-of-the-line privilege in Ordinance 27831.  The wellspring of preemption doctrine is the Constitution's Supremacy Clause, which states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be

bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, cl. 2; *see Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct. 1261, 1265 (2012). In all preemption cases, "the purpose of Congress is the ultimate touchstone." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Principles of federalism inform our search for congressional intent. Courts must assume "that the historic police powers of the States [a]re not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

A federal law may preempt state law expressly, when Congress explicitly provides. *See Kurns*, 132 S. Ct. at 1265–66. A federal law may also preempt state law impliedly, when state law either conflicts with federal law or when a federal statute exclusively occupies the field in which the state has legislated. *See id.* ATO rests its case wholly on the text of § 209(a) of the Clean Air Act, an express preemption provision. Determining whether Congress has expressly preempted state law begins with the federal statutory language itself, "which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Grp.*, 555 U.S. at 77 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

Section 209(a) provides:

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the

initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

42 U.S.C. § 7543(a). Clarifying the limits of § 209(a)'s preemptive reach is § 209(d), which states:

Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.

42 U.S.C. § 7543(d).

ATO argues that Ordinance 27831 fails as preempted by § 209(a)'s first sentence, because in enacting the head-of-the-line privilege, Dallas "adopt[ed] or attempt[ed] to enforce [a] standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part," 42 U.S.C. § 7543(a). We address whether Ordinance 27831 imposes any such "standard," either on its face, or as ATO also urges, by the inexorable, coercive effects flowing from its enforcement.[6]

## A. Whether Ordinance 27831 Imposes a Preempted "Standard" on its Face

ATO's first contention is the head-of-the-line privilege directly imposes a "standard for taxicabs [of] dedicated CNG." Applying the definition of a § 209(a) "standard" the Supreme Court discerned in *Engine Manufacturers Association v. South Coast Air Quality Management District* (*EMA*), 541 U.S. 246 (2004), we

---

[6] Finding the law does not impose a "standard," we need not address whether the statute "relat[es] to the control of emissions" or concerns "new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a). Of course, we could not conclude that § 209(a) preempts a state law unless the state law meets those latter requirements, in addition to serving as a "standard." *See* § 7543(a). Likewise, neither do we reach whether Ordinance 27831 is exempted from preemption under § 209(d) as a permissible effort by Dallas "to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." § 7543(d); *see Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1094 (D.C. Cir. 1996) (describing that § 209(d) safeguards the historic power of "states to adopt in-use regulations—such as carpool lanes, restrictions on car use in downtown areas, and programs to control extended idling of vehicles—that are expressly intended to control emissions").

No. 12-10470

disagree. The Court in *EMA* began its analysis saying that "standard" most generally means "that which 'is established by authority, custom, or general consent, as a model or example; criterion; test.'" 541 U.S. at 252–53 (quoting WEBSTER'S SECOND NEW INTERNATIONAL DICTIONARY 2455 (1945)). The Court then explicitly narrowed the meaning of "standard" in § 209(a)'s statutory context, highlighting that it refers to a mandatory, pollution-related obligation:

> The criteria referred to in § 209(a) relate to the emission characteristics of a vehicle or engine. To meet them the vehicle or engine *must not* emit more than a certain amount of a given pollutant, *must* be equipped with a certain type of pollution-control device, or *must* have some other design feature related to the control of emissions.

541 U.S. at 253 (emphasis added); *see also id.* (adding that "[t]his interpretation is consistent with the use of 'standard' throughout Title II of the [Clean Air Act] (which governs emissions from moving sources) to denote requirements such as numerical emission levels with which vehicles or engines *must* comply . . . or emission-control technology with which they *must* be equipped") (emphasis added) (internal citations omitted).[7] The Court in *EMA*, accordingly, found that directives by a California air pollution control body to certain municipal and private vehicle fleets to purchase reduced-emission vehicles were an "attempt to enforce" a "standard." 541 U.S. at 255 (internal quotation marks omitted). It was, the Court twice elaborated, "[a] *command, accompanied by sanctions*, that

---

[7] As the Oxford English Dictionary defines, "standard," in its oldest sense, is "[a] military or naval ensign," such as "the distinctive ensign of a king, great noble, or commander, or of a nation or city." 2 OXFORD ENGLISH DICTIONARY 814 (compact ed. 1979). "Standard," as in "standard of measure," appeared to develop figuratively from the word's connotation of hierarchical, martial uniformity: "the king's standard being the point of reunion of the army, and the centre from which commands are issued." *Id.*

certain purchasers may buy only vehicles with particular emission characteristics." *Id.* (emphasis added).[8]

As ATO does not dispute, Ordinance 27831 is not phrased as a "command, accompanied by sanctions," *EMA*, 541 U.S. at 255, to adopt CNG technology. Nowhere does the Dallas law require cab drivers to acquire or operate CNG cabs. By its terms, Ordinance 27831 demands no more of traditional cabs than that, if they wish to make unscheduled pick ups at Love Field, they honor the head-of-the-line privilege that CNG cabs may invoke. It provides an incentive to encourage cab drivers to transition to CNG technology, and we take instruction from the Court in *EMA*'s clarification that it was not reaching whether an incentive to adopt pollution-control measures would be a "standard" preempted by § 209(a). 541 U.S. at 254–55, 258. In considered discussion, Justice Scalia, writing for the Court, noted such incentive programs "are significantly different from command-and-control regulation," and that:

> Suffice it to say that nothing in the present opinion necessarily *entails* pre-emption of voluntary programs. It is at least arguable that the phrase 'adopt or attempt to enforce any standard' refers only to standards that *are* enforceable—a possibility reinforced by the fact that the prohibition is imposed only on entities (States and political subdivisions) that have power to enforce.

---

[8] The ruling in *EMA* is consistent with our sister circuits' pre-*EMA* precedent that state laws requiring that specific and certain percentages of auto sales be of low-emission motor vehicles are also preempted by § 209(a). *See Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Envtl. Prot.*, 208 F.3d 1, 6–7 (1st Cir. 2000); *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d Cir. 1998). The Ninth Circuit has subsequently applied *EMA* to other preemption provisions, to uphold or bar state emissions regulations. *Compare Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938–40 (9th Cir. 2011) (finding California rules related to registration and fees for diesel engines used in agriculture were not preempted by § 209(e) of the Clean Air Act), *with Pac. Merch. Shipping Ass'n v. Goldstene*, 517 F.3d 1108, 1114 (9th Cir. 2008) (holding California prohibitions on emissions from diesel engines used by ships in California coastal waters were a preempted "standard" under § 209(e) of the Clean Air Act).

No. 12-10470

*Id.* at 258. We agree with the district court in concluding that there is no language in Ordinance 27831 creating a standard that is enforceable to convert cabs from gasoline to CNG power. *See EMA*, 541 U.S. at 258. It is a compelling offer, not a compelled restraint. All Dallas may "enforce" under the law is compliance with the head-of-the-line privilege and the procedure for verifying dedicated CNG vehicles. We conclude that Ordinance 27831, enacted using traditional police powers, is not "superseded by . . . [any] clear and manifest purpose of Congress," above all where Congress's term "standard" has been identified as one "susceptible" to a mandate/incentive distinction. *See Altria Grp.*, 555 U.S. at 77 (internal quotation marks omitted).

**B.   Whether Ordinance 27831 is a "Standard" because of its Indirect Effects**

ATO additionally argues that even if Ordinance 27831 is not drafted unambiguously as a § 209(a) "standard," the head-of-the-line privilege's indirect effects render it one in application. It appears only one published district court decision, *Metropolitan Taxicab Board of Trade v. City of New York* (*Metro. II*), 633 F. Supp. 2d 83, 103–05 (S.D.N.Y. 2009), *aff'd on other grounds by* 615 F.3d 152 (2d Cir. 2010), addresses whether an incentive may be preempted by § 209(a) because its application would achieve, effectively, a mandatory "standard."

In *Metro. II*, New York City adopted a measure to raise the rate at which cab owners could lease hybrid vehicles to cab drivers for a twelve-hour shift by three dollars, but to reduce the same rate owners could charge for non-hybrid and non-wheelchair-accessible cabs by as much as twelve dollars. *Id.* at 85.[9] In

---

[9] In a prior case, *Metropolitan Taxicab Board of Trade v. City of New York* (*Metro. I*), No. 08-cv-7837(PAC), 2008 WL 4866021 (S.D.N.Y. Oct. 31, 2008), the same district court preliminarily enjoined an earlier New York City law, which mandated that *all* new taxis meet a miles per gallon minimum. The court found the plaintiffs "demonstrated a likelihood of success of showing" that the New York City measure was preempted by the federal Energy Policy and Conservation Act of 1975 ("EPCA"), 49 U.S.C. § 32919, which sets national fuel

10

## No. 12-10470

determining whether the scheme was preempted under the EPCA and, alternatively, under § 209(a), the district court asked whether the "new rules are a mandate to taxicab owners to purchase only hybrid or clean-diesel vehicles," and if so, "whether such a mandate is preempted by federal law." *Metro. II*, 633 F. Supp. 2d at 85. The court was careful to note that "a local law is not preempted when it only indirectly regulates parties within a preempted field and presents regulated parties with viable, non-preempted options." *Id.* at 95–96.

In distilling those principles, the *Metro. II* court relied on Supreme Court precedent interpreting the preemption provision in the Employee Retirement Income Security Act of 1974 ("ERISA"), which "supercede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a); *see Metro. II*, 633 F. Supp. 2d at 93–96; *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645 (1995); *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316 (1997). In *Travelers Insurance*, 514 U.S. 645, the Supreme Court analyzed surcharges imposed by New York to encourage health insurance customers, including ERISA plans, to choose Blue Cross & Blue Shield. The Court found the surcharges altered ERISA plans' "shopping decisions," but did "not affect the fact that any plan will shop for the best deal it can get, surcharges or no surcharges." *Id.* at 660; *see Dillingham Constr.*, 519 U.S. at 332–33. The Court concluded that the scheme was meaningfully distinct from state laws that "mandated employee benefit structures or their administration," or "provid[ed] alternative enforcement mechanisms." *Travelers Ins.*, 514 U.S. at 658. It

---

economy requirements. *Metro. I*, 2008 WL 4866021, at \*15. It was in reaction to the *Metro. I* ruling that New York City adopted the alternative approach at issue in *Metro. II*. *Metro. II*, 633 F. Supp. 2d at 85. Notably, the *Metro. I* court found the plaintiffs did not make a likely showing the law was preempted by the Clean Air Act, because the miles per gallon minimum was "silent as to emissions" and was not "a *de facto* regulation of emissions." *Metro. I*, 2008 WL 4866021, at \*14.

further distinguished the hypothetical "state law [that] might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers," such that it would qualify for preemption. *Id.* at 668; *see also Dillingham Constr.*, 519 U.S. at 333 ("It cannot be gainsaid that [the California law at issue] has the effect of encouraging apprenticeship programs—including ERISA plans—to meet the standards set out by California, but it has not been demonstrated here that the added inducement created by the wage break available on state public works projects is tantamount to a compulsion upon apprenticeship programs.").

The *Metro. II* district court found the New York City measure was so coercive as to indirectly mandate that cab owners purchase hybrids, "constitut[ing] an offer which can not, in practical effect, be refused." 633 F. Supp. 2d at 99. It concluded the plaintiffs established a likelihood of showing the lease rates imposed a preempted standard under § 209(a), as they "effectively force Fleet Owners to purchase hybrid taxicabs, and the purpose and effect of the rules is to reduce emissions." *Id.* at 105. The district court similarly found the plaintiffs established a likelihood of success in proving the rule was preempted under the EPCA. *Id.* at 103. It granted the plaintiffs' motion to preliminarily enjoin the rule. *Id.* at 106. The Second Circuit affirmed, but without determining whether the law was preempted by § 209(a). *Metro. II*, 615 F.3d at 158.

ATO argues, echoing the *Metro. II* district court, that the economic hardship wrought on traditional cabs at Love Field by Ordinance 27831 is "an effective mandate" to convert to CNG vehicles or to abandon "their chosen field of work." It specifies that "drivers had one, basic option if they wish to remain in business at Love Field: drive a CNG taxicab." The summary judgment evidence, particularly the taxi driver affidavits, does support the inference that

No. 12-10470

Ordinance 27831's head-of-the-line privilege has decreased business for traditional cabs servicing Love Field and increased the ranks of CNG cab drivers. We may further infer that the law alters the "shopping decisions" for traditional cab drivers in determining where in the City to operate. *See Travelers Ins.*, 514 U.S. at 660. But we agree with the district court that ATO does not offer record evidence to show that the law effectively compels a particular course of action. *See RSR Corp.*, 612 F.3d at 857. ATO does not point to evidence, for instance, that CNG cabs may displace traditional cabs servicing other parts of the City, or that traditional cab drivers could not compensate for losses at Love Field by soliciting passengers elsewhere. Rather, the undisputed facts show that of the nearly 2800 cabs in Dallas, at most 200 operate regularly at Love Field. By those numbers, even if CNG cabs were to gain exclusive command of the Love Field route by virtue of Ordinance 27831, they would comprise, at most, seven percent of the Dallas fleet. As Dallas further highlights, gasoline cab drivers enjoy some competitive advantages over CNG cab counterparts, such as the right to collect a surcharge from customers when gasoline rises above $3.01 per gallon. That Ordinance 27831 may have its intended effect and substitute CNG cabs for traditional cabs at Love Field does not show that Dallas cab drivers face "such acute, albeit indirect, economic effects . . . as to force" them to switch vehicles. *See Travelers Ins.*, 514 U.S. at 668; *Metro. II*, 633 F. Supp. 2d at 105.[10]

---

[10] ATO also relies on the Second Circuit decision in *Metro. II*, arguing that this court need not determine that Dallas's scheme amounts to an economic mandate to find it is preempted, since it "relates to" emissions control. The Second Circuit in *Metro. II* construed the EPCA's preemption provision, which broadly preempts state "law[s] or regulation[s] related to fuel economy standards," 49 U.S.C. § 32919(a); *see Metro. II*, 615 F.3d at 157–58, and not state "*standard[s]* relating to the control of emissions," as in § 209(a), 42 U.S.C. § 7543(a) (emphasis added). Even if Ordinance 27831 "relat[es] to the control of emissions," § 7543(a), that would not answer whether it is a preempted "standard," as defined in *EMA*. As described above, especially informed by the Supreme Court's considered discussion in *EMA*, we hold that in granting a head-of-the-line privilege to CNG cabs, Ordinance 27831 does not

13

No. 12-10470

Reaching that conclusion does not require us to parse precisely when an incentive program might turn sufficiently coercive to qualify as a *de facto* "standard." That question, factually and legally, remains for future cases. The record here, which ATO had the opportunity to develop in discovery, simply does not support ATO's theory of preemption by acute economic coercion. We conclude that the indirect consequences of Ordinance 27831 do not render it preempted by § 209(a).

## CONCLUSION

In light of the foregoing, we AFFIRM summary judgment in favor of Dallas.

---

by its terms impose a "standard."

14